## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Index No. _____

**07-80464**

CIV-HURLEY

-----------------------------------------------------------

DONNA SMITH,

     PLAINTIFF,

vs.

CARLTON ASSET MANAGEMENT
ANDREW ALAN WILSHIRE,
MARK L. MODIST,
JAMES JOSEPH RUSSO, and
JON PAUL VASTA,

     DEFENDANTS.

-----------------------------------------------------------

**COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff, Donna Smith ("Smith"), by and through her undersigned counsel, files this Complaint against Carlton Asset Management ("Carlton'), Andrew Alan Wilshire ("Wilshire"), Mark L. Modist ("Modist"), James Joseph Russo ("Russo"), and Jon Paul Vasta ("Vasta") (collectively, the "Defendants"), and alleges as follows:

### THE PARTIES

**A.**     **The Plaintiff**

     1.     At all times material hereto, Plaintiff was over the age of eighteen and residing in Tulsa, Oklahoma.

**B.**     **The Defendants**

     2.     Upon information and belief, Carlton Asset Management is a Florida Corporation, organized and existing under and by virtue of the laws of the State of Florida, and conducting business in the State of Florida.

3.     Upon information and belief, Andrew Alan Wilshire is an individual residing in Palm Beach County, Florida.

4.     Upon information and belief, Mark L. Modist is an individual residing in Palm Beach County, Florida.

5.     Upon information and belief, James Joseph Russo is an individual residing in Palm Beach County, Florida.

6.     Upon information and belief, Jon Paul Vasta is an individual residing in Palm Beach County, Florida.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise and are pursuant to Florida Statutes §517.011 et. seq. ("Chapter 517").

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(1), since the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Moreover, Plaintiff and Defendants are citizens of different states.

9.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a) (action founded solely on diversity), because Defendants are found in, inhabit, or transact business in this District and/or substantial and material events and omissions giving rise to this action, including certain transactions, acts, practices and course of business, took place in the Southern District of Florida.   In particular, Carlton and Global are Florida Corporations.   Carlton's principal address is in West Palm Beach, Florida and Global's principal address is in Boca Raton, Florida.  Upon information and belief, Defendants Wilshire, Modist, Russo and Vasta all reside in this District.

## FACTUAL STATEMENT

10.    This matter involves the improper solicitation and purported investments in precious metals orchestrated by Defendants.

11.    The Plaintiff is a divorced 66 year old retired school teacher who had absolutely no experience investing in commodities or futures contracts prior to investing her retirement funds with Defendants.

12.    The individual Defendants have all been recently barred from the commodities industry because they previously operated a registered commodities firm in violation of industry rules and regulations.  In complete and total disregard of State and Federal regulations, the individual Defendants opened an unregistered firm, Carlton, and operated a boiler-room used to dupe innocent investors around the world.

13.    Plaintiff was solicited by Mr. Russo over the telephone to invest with Carlton to trade precious metals.  Mr. Russo claimed, amongst other misrepresentations that:

> A.  Carlton was an experienced company with a strong management team and experienced traders;
>
> B.  Plaintiff's risks were limited and she would earn profits significantly greater than her initial investment; and
>
> C.  Carlton had a successful track record managing customer accounts.

14.    Each and every one of Defendants' misrepresentations were false.  These representations were more than mere puffery because, amongst other reasons:

> A.  Carlton did not have a positive track record managing customer accounts;
>
> B.  Carlton's management team had been barred from the commodities industry; and

      C.   Plaintiff's risk was huge because Defendants intended to convert her money for their own benefit through high commissions and other means.

15.     Beginning in or about early 2006, Carlton began a national marketing campaign using high-pressure sales tactics, by and through its associated persons, including but not limited to Russo and Vasta, to convince prospective investors that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme.

16.     Carlton, by and through its associated persons, including but not limited to, Russo and Vasta, claimed that they were expert traders and would monitor the market and instruct customers when they should liquidate their accounts for a profit.

17.     Defendant Wilshire, at all times material hereto, served as an Associated Person of Carlton.[1]

18.     Defendant Modist, at all times material hereto, served as the Principal and Director of Global.[2]

19.     Defendant Russo, at all times material hereto, served as an Associated Person of Carlton.

20.     Defendant Vasta, at all times material hereto, served as the Principal, Director and Associated Person of Carlton.[3]

---

[1]    Attached hereto as Exhibit "A" is a copy of a letter that was included as part of the marketing material evidencing Wilshire's status as an Associated Person. However, this representation is false. Upon information and belief, Wilshire is actually the Principal and Director of Carlton.

[2]    Attached hereto as Exhibit "B" is a copy of Global's Annual Report describing Mr. Modist as the Principal and Director of the company.

[3]    Attached hereto as Exhibit "C" is a copy of Carlton's Corporate Registration describing Mr. Vasta as the Principal and Director of the company. In addition, Mr. Vasta represented himself as being a commodities trader/broker, despite the fact that he is not licensed due to his prior felony conviction.

21.     On or about February 2006, Plaintiff was solicited by Russo about investing with Carlton, which was described to Plaintiff as an established commodities firm investing in precious metals.

22.     Defendants, both orally and through written communication, characterized the venture as a high profit, short term, safe investment with little or no risk.

23.     Subsequently, on or about February 5, 2006, Plaintiff sent an initial investment to Defendants for what she believed was to purchase physical precious metals, specifically silver.

24.     Prior to Plaintiff investing her funds with Defendants, Defendants failed to disclose amongst other things, that:

A.  Mr. Wilshire, Mr. Modist and Mr. Russo were no longer registered with the National Futures Association ("NFA") due to their prior fraudulent misconduct;[4]

B.  Mr. Wilshire, Mr. Modist and Mr. Russo failed to disclose that they were past business associates affiliated with Wilshire Investment Management Corp. and Global Asset Management, Inc. for conducting the same fraudulent investment scheme as alleged herein, for which the CFTC found them guilty of the acts alleged and permanently enjoined Defendants, including Global, from conducting or being involved in any commodities related activities in the future;[5]

C.  Mr. Vasta is a convicted felon pleading guilty to criminal charges in 2002;[6]

D.  Mr. Vasta was not licensed to purchase and/or sell commodities; and

E.  Carlton and Global were not properly registered with the NFA or the State of Florida to sell commodities.

---

[4]     Attached hereto as Exhibit "D" is a copy of Mr. Wilshire, Mr. Modist and Mr. Russo's National Futures Association ("NFA") Report, including the recent Commodities Futures Trading Commission ("CFTC") action and the federal court case in the Southern District of Florida against Defendants which caused them to be permanently enjoined from having any form of involvement in the commodities market.

[5]     See Exhibit D.

[6]     Attached hereto as Exhibit "E" is a copy of Mr. Vasta's NFA Report and the CFTC action revoking his license due to his felony conviction.

25.     Defendants made misrepresentations and omissions concerning, among other things, the company's prior history; business operations; the likelihood that a customer would realize large profits from purchasing commodities; the risks involved in trading commodities; the true statute of Plaintiff's investments; and the fees charged.

26.     The marketing material sent to Plaintiff after she already made her initial investment contained material misrepresentations and omissions concerning, among other things, the employees' relevant backgrounds, including the prior CFTC action against defendants for the same fraudulent conduct, and the fact that a substantial amount of an investor's initial investment was comprised of various commissions and fees, leading investors, such as Plaintiff, to suffer a dramatic loss as soon as they invested!

27.     During the telephone calls with Plaintiff, Mr. Russo and Mr. Vasta reiterated and expanded upon these misrepresentations when soliciting Plaintiff to invest in precious metals.

28.     Each of the following misrepresentations and omissions concern statements of material facts and have been made with the knowledge and or at the direction of the Individual Defendants.

**COUNT I**
**VIOLATION OF FLORIDA'S SECURITIES AND**
**INVESTOR PROTECTION ACT, CHAPTER 517**

29.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "28" above, with the same force and effect as if set forth fully herein. This claim is asserted against all Defendants.

30.     This is an action pursuant to Chapter 517, known as "Florida's Securities and Investor Protection Act."

31.     Section 517.301, Florida Statutes, states in pertinent part:

6

(1)     It is unlawful and a violation of the provisions of this Chapter for a person:

(a)     in connection with the rendering of any investment advice or in connection with the offer, sale or purchase of any instrument or security:

1.     to employ any device, scheme or artifice to defraud;

2.     to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; or

3.     to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon a person.

FLA. STAT. § 517.301.

32.     In connection with the rendering of investment advice and in connection with the purchase and sale of the investments at issue, Defendants directly or indirectly employed a device, artifice or scheme to defraud Ms. Smith, *to wit*, knowingly, recklessly or negligently engaged in actions, transactions, practices and courses of business which operated as a fraud upon Ms. Smith, in violation of Florida Statutes § 517.301 (1)(a)1, 2 and 3.

33.     Defendants obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, in violation of Florida Statutes § 517.301 (1)(a)2.

34.     In order to induce Ms. Smith to invest with Defendants and to make certain investments and/or transactions, Defendants knowingly and/or recklessly or negligently made numerous misrepresentations and/or omissions of material facts to Ms. Smith.  Among other things, Defendants represented that:

A.  Leveraged investments in precious metals were suitable for Ms. Smith;

B.  Carlton and Global were reputable companies;

C.  Investors would reap tremendous profits in a short time, with little or no risk; and

D.  Investors would be purchasing physical precious metals that Global would hold in storage on behalf of customers.

35.  Further, Defendants omitted to state to Ms. Smith material facts which operated as a fraud on Ms. Smith including, among other things:

A.  The Defendants' true background, including their permanent enjoinment from the commodities market;

B.  The prior CFTC action against Defendants for the same fraudulent conduct;

C.  There was no actual purchase or storage of the commodities;

D.  Global never actually lent any funds for the purchase of commodities; and

E.  The investment was illiquid.

36.  Each of these omissions and/or misrepresentations was material to Ms. Smith, and each of these omissions and/or misrepresentations operated as a fraud on Ms. Smith.

37.  Ms. Smith would not have entrusted funds to Defendants, nor would she have allowed Defendants to invest these funds if such material facts had been disclosed prior to investing her funds with Defendants.

38.  Defendants made these misrepresentations and/or omissions with the intent to induce Ms. Smith to rely thereon.

39.  Defendants made these misrepresentations and/or omissions prior to, and independent of, Ms. Smith signing the account forms.

40.  At the time the misrepresentations and/or omissions were made, Defendants knew they were false, or acted with reckless or negligent disregard for the truth.

41.  Ms. Smith relied, to her detriment, on material misrepresentations and/or

omissions made by Defendants, and Defendants were aware of such reliance by Ms. Smith when she made her investment decisions.

42.     As a result of Defendants' conduct, Ms. Smith has suffered damages in an amount not less than $100,000.00, exclusive of interest and costs and other relief.

**COUNT II**
**FRAUDULENT INDUCEMENT**

43.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "28" above, with the same force and effect as if set forth fully herein. This claim is asserted against all Defendants.

44.     In order to induce Ms. Smith to invest nearly her entire retirement account with Defendants, Defendants knowingly and/or recklessly made numerous material misrepresentations and omissions, as described herein.

45.     Specifically, Defendants omitted to state to Ms. Smith that:

    A. The investments would subject Ms. Smiths' funds to a substantial risk of loss in value;

    B. The principals were not successful business people;

    C. The Defendants had a prior judgment against them for the same fraudulent conduct;

    D. The Defendants were permanently enjoined from conducted or being involved in any commodities related activities;

    E. There was no actual purchase or storage of the commodities; and

    F. Global never actually lent any funds for the purchase of commodities;

46.     Each of these omissions, which were made by and/or adopted by all the Defendants named in this action, was material to Ms. Smith, who would not have entered into an

9

agreement to entrust her funds with Defendants and allow Defendants to invest them had these facts been disclosed.

47.     Defendants had a duty to disclose, more specifically, a duty to speak about the omitted facts since they would have been viewed by a reasonable investor, such as Ms. Smith, as having significantly altered the "total mix" of information made available to her.

48.     Further, Defendants had a duty to disclose if the original statements, such as those made orally and in the marketing materials, were false when issued, then Defendants had a duty to correct the statements, especially since Defendants knew or should have known that Ms. Smith was relying on the misstatements and omissions in deciding whether to invest her funds with Defendants.

49.     Specifically, Defendants falsely stated to Ms. Smith that:

    A.  Defendants were licensed to sell the investments;

    B.  Carlton was registered to purchase the investments;

    C.  Global was purchasing and storing the commodities; and

    D.  The investments were safe and profitable and had guaranteed returns.

50.     Ms. Smith did not know that the misrepresentations made by and/or adopted by all the Defendants were false, nor was she aware that certain material facts were intentionally omitted by Defendants. The misrepresentations and omissions were made by and/or adopted by all the Defendants with the express purpose of deceiving and defrauding Ms. Smith with the intent of inducing Ms. Smith to rely thereon and transfer funds to Defendants to invest.

51.     At the time, Ms. Smith believed the misrepresentations made by and/or adopted by all the Defendants to be true and justifiably relied thereon.

52.     The Defendants' intentional and/or reckless conduct in deceiving and defrauding Ms. Smith into transferring funds to Defendants occurred prior to, and independent of, any contractual obligations Defendants had to Ms. Smith.

53.     WHEREFORE, as a direct and proximate result of those misrepresentations and omissions, Ms. Smith has suffered damages in an amount not less than $100,000.00, exclusive of interest and costs and other relief.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

54.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs "1" through "28" above, with the same force and effect as if set forth fully herein.  This claim is asserted against all Defendants.

55.     Ms. Smith placed her full faith and trust in Defendants to handle her accounts and to purchase precious metal and/or implement appropriate investment strategies, since Defendants represented themselves as being highly knowledgeable and licensed brokers, and thus, there was the creation of a fiduciary between the parties.

56.     Further, Defendants were in possession of superior skill and knowledge with respect to investment allocations, commodities, and suitability, upon which Ms. Smith justifiably relied thereon, and thus, Defendants owed Ms. Smith a fiduciary duty not to abuse that superior skill and knowledge.

57.     Defendants owed Ms. Smith the fiduciary duty to act in a fair, honest, just, trustworthy and equitable manner; to act in furtherance of Ms. Smith's best interest with the utmost care and loyalty; to refrain from abusing their position of control over Ms. Smith's account; to preserve her principal investment; and to provide accurate and reliable information as to the risks associated with the leveraged investments in precious metals.

58.     Defendants breached their fiduciary duty and conducted themselves toward Ms. Smith in a willful, reckless, and malicious manner by undertaking to deceive and harm Ms. Smith by making misrepresentations, omissions and conducting themselves in a manner that placed Ms. Smith's investment at risk.

59.     WHEREFORE, Ms. Smith has been damaged by Defendants' conduct as set forth above in an amount in excess of $100,000.00, exclusive of interest and costs and other relief.

## CONCLUSION

WHEREFORE, Plaintiff, Donna Smith, demands a trial by jury and a resulting judgment against each of the Defendants, jointly and severally, for compensatory damages in excess of $100,000.00 plus interest, punitive damages, and for such other and further relief as the Court deems just and proper.

Respectfully submitted by:

BLUM & SILVER, LLP
Attorneys for Plaintiff
12540 W. Atlantic Blvd.
Coral Springs, FL 33071
Telephone:     (954) 255-8181
Facsimile:     (954) 255-8175

By:_____              Date:_____5/21/07_____
    SCOTT L. SILVER
    Fla. Bar No. 095631

# EXHIBIT A

**Blum & Silver, LLP**
12540 W. Atlantic Blvd.
Coral Springs, FL 33071
Phone: (954) 255-8181
Fax: (954) 255-8175

# CARLTON ASSET MANAGEMENT

Dear Ms. Smith,

It is our great pleasure to welcome you to Carlton Asset Management, and the exciting world of the precious metals market. We hope your review of the enclosed information will be useful and constructive.

Our company is supported by talented account executives, knowledgeable traders and experienced research analysts that have a combined 40 years experience in stocks, bonds, currencies and commodities. Above all, we work hard, we believe strongly in what we do, and we think of your investment needs first and always.

Carlton Asset Management specializes in the buying and selling of precious metals. Our focus for investors is to discover trades that offer the potential for large capital appreciation.

Carlton Asset Management goal is to provide clients with sound service and solid information. As the world begins the new millennium and global economies change, we believe there are very few investments that can match the physical precious metals market. You can participate in the same market as the world's largest investors, multinational corporations, and some of the major banks worldwide.

We hope you will consider putting Carlton Asset Management experience and service to work for you. At Carlton Asset Management, we are proud of our professionalism and integrity.

Once again, welcome to Carlton Asset Management we are looking forward to a long and rewarding association.

Sincerely,



Andrew Wilshire
Senior Metals Specialist

| | 515 N. Flagler Dr. | PHONE | 561.515.4014 |
| | Ste 300 | | 800.449.5113 |
| | West Palm Beach, Fl. | FAX | 561. 802.4199 |
| | 33401 | | |

# EXHIBIT B

**Blum & Silver, LLP**
12540 W. Atlantic Blvd.
Coral Springs, FL 33071
Phone: (954) 255-8181
Fax: (954) 255-8175

# 2006 FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P96000011422

FILED
Apr 28, 2006
Secretary of State

**Entity Name:** GLOBAL ASSET MANAGEMENT, INC.

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|
| 499 E PALMETTO PARK RD<br>222<br>BOCA RATON, FL 33432    US | 1900 GLADES RD.<br>#355<br>BOCA RATON, FL 33431    US |
| **Current Mailing Address:** | **New Mailing Address:** |
| 499 E PALMETTO PARK RD<br>222<br>BOCA RATON, FL 33432    US | 1900 GLADES RD.<br>#355<br>BOCA RATON, FL 33431    US |

FEI Number: 65-0640704        FEI Number Applied For ( )        FEI Number Not Applicable ( )        Certificate of Status Desired (X)

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|
| HOMER & BONNER, P.A., MARIE A. WHITES<br>100 SE 2ND ST., STE 3400<br>INTERNATIONAL PLACE<br>MIAMI, FL 33131 US | HOMER & BONNER, P.A., MARIE A. WHITES<br>1200 FOUR SEASONS TOWER<br>1441 BRICKELL AVENUE<br>MIAMI, FL 33131 US |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____        04/28/2006
             Electronic Signature of Registered Agent        Date

Election Campaign Financing Trust Fund Contribution ( ).

## OFFICERS AND DIRECTORS:                    ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:

| Title: | PDTS | ( ) Delete | | Title: | PDTS | (X) Change ( ) Addition |
|---|---|---|---|---|---|---|
| Name: | MODIST, MARK | | | Name: | MODIST, MARK | |
| Address: | 499 E PALMETTO PARK RD #222 | | | Address: | 1900 GLADES RD., #355 | |
| City-St-Zip: | BOCA RATON, FL | | | City-St-Zip: | BOCA RATON, FL 33431 | |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  MARK MODIST        PRES        04/28/2006
             Electronic Signature of Signing Officer or Director        Date

# EXHIBIT C

**Blum & Silver, LLP**
12540 W. Atlantic Blvd.
Coral Springs, FL 33071
Phone: (954) 255-8181
Fax: (954) 255-8175



## Florida Profit

### CARLTON ASSET MANAGEMENT, CORP

### PRINCIPAL ADDRESS
515 N. FLAGLER DR. SUITE 305
WEST PALM BEACH FL 33401
Changed 04/24/2006

### MAILING ADDRESS
515 N. FLAGLER DR. SUITE 305
WEST PALM BEACH FL 33401
Changed 04/24/2006

| Document Number | FEI Number | Date Filed |
|---|---|---|
| P05000163814 | 203946961 | 12/15/2005 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

## Registered Agent

| Name & Address |
|---|
| SPIEGEL & UTRERA, P.A.<br>1840 SW 22ND ST.<br>4TH FLOOR<br>MIAMI FL 33145 |

## Officer/Director Detail

| Name & Address | Title |
|---|---|
| VASTA, JON<br>515 N. FLAGLER DR STE 305<br><br>WEST PALM BEACH FL 33401 | PD |

## Annual Reports

| Report Year | Filed Date |
|---|---|



| 2006 | 07/05/2006 |
| 2007 | 02/01/2007 |

No Events
No Name History Information

## Document Images
Listed below are the images available for this filing.

02/01/2007 -- ANNUAL REPORT
07/05/2006 -- ANNUAL REPORT
12/15/2005 -- Domestic Profit

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**



# EXHIBIT D



# Details

**ANDREW ALAN WILSHIRE**                                    **NFA ID: 0253752**

**Current Status**

WILSHIRE INVESTMENT MANAGEMENT CORP
· ASSOCIATED PERSON REGISTERED
· NFA ASSOCIATE MEMBER APPROVED
· PRINCIPAL APPROVED



| **Regulatory Actions** | | | **NFA Arbitration Awards** | | | **CFTC Reparations Cases** | |
|---|---|---|---|---|---|---|---|
| **Agency** | **Number** | | **Role** | **Number** | | Total | 1 |
| NFA | 0 | | Claimant | 0 | | | details... |
| CFTC | 1 | | Respondent | 0 | | | |
| Exchanges | 0 | | Representative | 0 | | | |
| | details... | | | details... | | | |

**Also Known As**

No other names

**Security Futures Proficiency Training**

| Description | Date |
|---|---|
| SECURITY FUTURES TRAINING COMPLETED | 11/08/2002 |

**Doing Business As**

No other names

**History**

| Status | Effective Date |
|---|---|
| AMERICAN FUTURES GROUP INC | |
| · ASSOCIATED PERSON PENDING STATUS WITHDRAWN | 02/23/1994 |
| · NFA ASSOCIATE MEMBER WITHDRAWN | 02/23/1994 |
| · NFA ASSOCIATE MEMBER APPROVED | 01/18/1994 |
| · ASSOCIATED PERSON TEMPORARY LICENSE | 01/18/1994 |
| · ASSOCIATED PERSON PENDING | 12/31/1993 |
| · NFA ASSOCIATE MEMBER PENDING | 12/31/1993 |
| BEDDOWS COMMODITIES INC | |
| · ASSOCIATED PERSON WITHDRAWN | 09/30/1999 |
| · NFA ASSOCIATE MEMBER WITHDRAWN | 09/30/1999 |
| · ASSOCIATED PERSON REGISTERED | 06/03/1998 |
| · NFA ASSOCIATE MEMBER APPROVED | 04/23/1998 |
| · ASSOCIATED PERSON TEMPORARY LICENSE | 04/23/1998 |
| · ASSOCIATED PERSON PENDING | 04/22/1998 |
| · NFA ASSOCIATE MEMBER PENDING | 04/22/1998 |

• ASSOCIATED PERSON WITHDRAWN                                          02/01/1997
• NFA ASSOCIATE MEMBER WITHDRAWN                                       02/01/1997
• ASSOCIATED PERSON REGISTERED                                        08/02/1994
• NFA ASSOCIATE MEMBER APPROVED                                       08/02/1994
• ASSOCIATED PERSON PENDING                                           06/15/1994
• NFA ASSOCIATE MEMBER PENDING                                        06/15/1994
STELLAR FUTURES
• ASSOCIATED PERSON WITHDRAWN                                         09/11/2000
• NFA ASSOCIATE MEMBER WITHDRAWN                                      09/11/2000
• PRINCIPAL WITHDRAWN                                                 09/11/2000
• ASSOCIATED PERSON REGISTERED                                        05/05/2000
• NFA ASSOCIATE MEMBER APPROVED                                       05/05/2000
• PRINCIPAL APPROVED                                                  05/05/2000
• BRANCH MANAGER PENDING STATUS WITHDRAWN                             04/19/2000
• ASSOCIATED PERSON PENDING                                           04/18/2000
• BRANCH MANAGER PENDING                                              04/18/2000
• NFA ASSOCIATE MEMBER PENDING                                        04/18/2000
• PRINCIPAL PENDING                                                   04/18/2000
WILSHIRE COMMODITY CORPORATION
• NFA ASSOCIATE MEMBER WITHDRAWN                                      12/27/2004
• ASSOCIATED PERSON WITHDRAWN                                         12/27/2004
• PRINCIPAL PENDING STATUS WITHDRAWN                                  11/22/2004
• NFA ASSOCIATE MEMBER APPROVED                                      09/21/2004
• ASSOCIATED PERSON REGISTERED                                        09/21/2004
• PRINCIPAL PENDING                                                   08/23/2004
• NFA ASSOCIATE MEMBER PENDING                                        08/23/2004
• ASSOCIATED PERSON PENDING                                           08/23/2004
WILSHIRE INVESTMENT MANAGEMENT CORP
• PRINCIPAL ENDED WITH WILSHIRE INVESTMENT MANAGEMENT                 10/23/2001
• PRINCIPAL ADDED WITH WILSHIRE INVESTMENT MANAGEMENT                 09/18/2000
• PRINCIPAL COMPLETE WITH WILSHIRE INVESTMENT MANAGEMENT              09/18/2000
• ASSOCIATED PERSON REGISTERED                                        09/18/2000
• NFA ASSOCIATE MEMBER APPROVED                                      09/18/2000
• PRINCIPAL APPROVED                                                  09/18/2000
• ASSOCIATED PERSON PENDING                                           09/15/2000
• NFA ASSOCIATE MEMBER PENDING                                       09/15/2000
• PRINCIPAL PENDING                                                   09/15/2000
• ASSOCIATED PERSON WITHDRAWN                                         07/05/2000
• NFA ASSOCIATE MEMBER WITHDRAWN                                      07/05/2000
• PRINCIPAL WITHDRAWN                                                 07/05/2000
• ASSOCIATED PERSON REGISTERED                                        02/17/2000
• PRINCIPAL APPROVED                                                  02/17/2000
• NFA ASSOCIATE MEMBER APPROVED                                      10/18/1999
• ASSOCIATED PERSON TEMPORARY LICENSE                                10/18/1999
• ASSOCIATED PERSON PENDING                                           10/14/1999
• NFA ASSOCIATE MEMBER PENDING                                       10/14/1999
• PRINCIPAL PENDING                                                   10/14/1999
• PRINCIPAL WITHDRAWN                                                 01/31/1999
• ASSOCIATED PERSON WITHDRAWN                                         04/20/1998
• ASSOCIATED PERSON REGISTERED                                        11/07/1997
• PRINCIPAL APPROVED                                                  11/07/1997

| | |
|---|---|
| • ASSOCIATED PERSON PENDING | 10/28/1997 |
| • PRINCIPAL PENDING | 07/14/1997 |

©2003-2007 National Futures Association

# Regulatory Actions

**ANDREW ALAN WILSHIRE**                                                         **NFA ID: 0253752**

This page includes information regarding the **Case History** of these matters concerning the person or firm you are researching. It may also include the **Outcome** if the cases have been resolved regarding this person or firm.

Just like in all legal proceedings, when regulatory actions are resolved, it is almost always by settlement, not adjudication. A settlement may result in the imposition of a penalty without a determination of the merits of the charges or formal findings of wrongdoing. If the particular matter you are interested in has been resolved, please refer to the **Narrative**, and for certain NFA cases, the decision as provided in the **Case Documents** summary, to see whether it was adjudicated or settled.

| Contributor | Case # | Action Type | Effective Date | Case Outcome |
|---|---|---|---|---|
| CFTC | 04-80862 | • CFTC INJUNCTIVE ACTION | 12/05/2005 | • FINE $100000 |
| | | | | • OTHER (SEE NARRATIVE) |
| | | | | • JOINT OWED |
| | | | | • STOP SOLICITING |
| | | | | • MAKE RESTITUTION TO CUSTMERS |



# Case Summary

**ANDREW ALAN WILSHIRE**          **CFTC 04-80862**          **NFA ID: 0253752**

### Respondent/Effective Date Summary

| NFA ID | Respondent | Effective Date |
|---|---|---|
| 0289816 | MALCOLMSON, ERIC SCOTT | 12/05/2005 |
| 0278238 | NATIONAL COMMODITIES CORPORATION INC | |
| 0292571 | RUSSO, JAMES JOSEPH | 12/05/2005 |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | 12/05/2005 |
| 0253752 | WILSHIRE, ANDREW ALAN | 12/05/2005 |

### Rule Summary

| NFA ID | Respondent | Rule Type |
|---|---|---|
| 0289816 | MALCOLMSON, ERIC SCOTT | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |
| 0292571 | RUSSO, JAMES JOSEPH | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |
| 0253752 | WILSHIRE, ANDREW ALAN | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |

### Action Summary

| NFA ID | Respondent | Action Types |
|---|---|---|
| 0289816 | MALCOLMSON, ERIC SCOTT | • CFTC INJUNCTIVE ACTION |
| 0278238 | NATIONAL COMMODITIES CORPORATION INC | • CFTC INJUNCTIVE ACTION |
| 0292571 | RUSSO, JAMES JOSEPH | • CFTC INJUNCTIVE ACTION |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | • CFTC INJUNCTIVE ACTION |
| 0253752 | WILSHIRE, ANDREW ALAN | • CFTC INJUNCTIVE ACTION |

### Penalty/Event Summary

| NFA ID | Respondent | Penalty/Event | Event Date |
|---|---|---|---|
| 0289816 | MALCOLMSON, ERIC SCOTT | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |

| 0292571 | RUSSO, JAMES JOSEPH | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |
| 0253752 | WILSHIRE, ANDREW ALAN | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |

## Narrative Summary

### General Case Narrative

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire, Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today announced the filing of an injunctive complaint in the United States District Court for the Southern District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale, Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire, Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a customer would realize large profits from commodity options trading and by misrepresenting the risk involved in trading commodity options. According to the complaint, these defendants also misled customers about the effect current events would have on option prices by citing well-known public information that was already factored into the options prices. As also alleged, during the course of their solicitations, these defendants failed to disclose their excessively poor trading record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

------------------------------------------------------------------------

Updated September 28, 2004

**Narrative for 0289816 - MALCOLMSON, ERIC SCOTT**

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire,
Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a
customer would realize large profits from commodity options trading and by misrepresenting the
risk involved in trading commodity options. According to the complaint, these defendants also
misled customers about the effect current events would have on option prices by citing well-
known public information that was already factored into the options prices. As also alleged, during
the course of their solicitations, these defendants failed to disclose their excessively poor trading
record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in
September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and
severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of
defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the
Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel

Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

------------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

### Narrative for 0278238 - NATIONAL COMMODITIES CORPORATION INC
Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire,
Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a
customer would realize large profits from commodity options trading and by misrepresenting the
risk involved in trading commodity options. According to the complaint, these defendants also
misled customers about the effect current events would have on option prices by citing well-
known public information that was already factored into the options prices. As also alleged, during
the course of their solicitations, these defendants failed to disclose their excessively poor trading
record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in
September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and
severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of
defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the
Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel
Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

---------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

### Narrative for 0292571 - RUSSO, JAMES JOSEPH

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire, Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a customer would realize large profits from commodity options trading and by misrepresenting the risk involved in trading commodity options. According to the complaint, these defendants also misled customers about the effect current events would have on option prices by citing well-known public information that was already factored into the options prices. As also alleged, during the course of their solicitations, these defendants failed to disclose their excessively poor trading record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

----------------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

**Narrative for 0280498 - WILSHIRE INVESTMENT MANAGEMENT CORP**

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire,
Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a
customer would realize large profits from commodity options trading and by misrepresenting the
risk involved in trading commodity options. According to the complaint, these defendants also
misled customers about the effect current events would have on option prices by citing well-
known public information that was already factored into the options prices. As also alleged, during
the course of their solicitations, these defendants failed to disclose their excessively poor trading
record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in
September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and
severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of
defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the

Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

------------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of $147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

**Narrative for 0253752 - WILSHIRE, ANDREW ALAN**
Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire,
Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a
customer would realize large profits from commodity options trading and by misrepresenting the
risk involved in trading commodity options. According to the complaint, these defendants also
misled customers about the effect current events would have on option prices by citing well-
known public information that was already factored into the options prices. As also alleged, during
the course of their solicitations, these defendants failed to disclose their excessively poor trading
record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in
September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and
severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of
defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the
Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel
Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

---------------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

©2003-2007 National Futures Association



# Details

**JAMES JOSEPH RUSSO**  NFA ID: 0292571

**Current Status**

WILSHIRE INVESTMENT MANAGEMENT CORP
• ASSOCIATED PERSON REGISTERED
• NFA ASSOCIATE MEMBER APPROVED

**Regulatory Actions**

| Agency | Number |
|---|---|
| NFA | 0 |
| CFTC | 1 |
| Exchanges | 0 |

details...

**NFA Arbitration Awards**

| Role | Number |
|---|---|
| Claimant | 0 |
| Respondent | 0 |
| Representative | 0 |

details...

**CFTC Reparations Cases**

| | |
|---|---|
| Total | 0 |

details...

**Also Known As**

No other names

**Security Futures Proficiency Training**

No proficiency information available

**Doing Business As**

No other names

**History**

| Status | Effective Date |
|---|---|
| ATLAS FUTURES INC | |
| • ASSOCIATED PERSON WITHDRAWN | 08/23/2000 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 08/23/2000 |
| • PRINCIPAL WITHDRAWN | 08/23/2000 |
| • ASSOCIATED PERSON REGISTERED | 07/14/2000 |
| • PRINCIPAL APPROVED | 07/14/2000 |
| • NFA ASSOCIATE MEMBER APPROVED | 06/14/2000 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 06/14/2000 |
| • ASSOCIATED PERSON PENDING | 06/13/2000 |
| • NFA ASSOCIATE MEMBER PENDING | 06/13/2000 |
| • PRINCIPAL PENDING | 06/13/2000 |
| MERIDIAN COMMODITY CORPORATION | |
| • ASSOCIATED PERSON WITHDRAWN | 05/12/1999 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 05/12/1999 |
| • ASSOCIATED PERSON REGISTERED | 02/10/1999 |
| • NFA ASSOCIATE MEMBER APPROVED | 01/22/1999 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 01/22/1999 |
| • ASSOCIATED PERSON PENDING | 01/14/1999 |

- NFA ASSOCIATE MEMBER PENDING                 01/14/1999

WILSHIRE INVESTMENT MANAGEMENT CORP
- ASSOCIATED PERSON REGISTERED             05/14/2001
- NFA ASSOCIATE MEMBER APPROVED          04/25/2001
- ASSOCIATED PERSON TEMPORARY LICENSE     04/25/2001
- ASSOCIATED PERSON PENDING              04/18/2001
- NFA ASSOCIATE MEMBER PENDING            04/18/2001

©2003-2007 National Futures Association

# Regulatory Actions

## JAMES JOSEPH RUSSO                                          NFA ID: 0292571

This page includes information regarding the **Case History** of these matters concerning the person or firm you are researching. It may also include the **Outcome** if the cases have been resolved regarding this person or firm.

Just like in all legal proceedings, when regulatory actions are resolved, it is almost always by settlement, not adjudication. A settlement may result in the imposition of a penalty without a determination of the merits of the charges or formal findings of wrongdoing. If the particular matter you are interested in has been resolved, please refer to the **Narrative**, and for certain NFA cases, the decision as provided in the **Case Documents** summary, to see whether it was adjudicated or settled.

| Contributor | Case # | Action Type | Effective Date | Case Outcome |
|---|---|---|---|---|
| CFTC | 04-80862 | • CFTC INJUNCTIVE ACTION | 12/05/2005 | • FINE $100000 |
| | | | | • OTHER (SEE NARRATIVE) |
| | | | | • JOINT OWED |
| | | | | • STOP SOLICITING |
| | | | | • MAKE RESTITUTION TO CUSTMERS |



# Case Summary

**JAMES JOSEPH RUSSO**                    **CFTC 04-80862**                    **NFA ID: 0292571**

### Respondent/Effective Date Summary

| NFA ID | Respondent | Effective Date |
|--------|-----------|----------------|
| 0289816 | MALCOLMSON, ERIC SCOTT | 12/05/2005 |
| 0278238 | NATIONAL COMMODITIES CORPORATION INC | |
| 0292571 | RUSSO, JAMES JOSEPH | 12/05/2005 |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | 12/05/2005 |
| 0253752 | WILSHIRE, ANDREW ALAN | 12/05/2005 |

### Rule Summary

| NFA ID | Respondent | Rule Type |
|--------|-----------|-----------|
| 0289816 | MALCOLMSON, ERIC SCOTT | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |
| 0292571 | RUSSO, JAMES JOSEPH | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |
| 0253752 | WILSHIRE, ANDREW ALAN | • CEA 4c(b) - ILLEGAL TRADING OF COMMODITY OPTIONS |

### Action Summary

| NFA ID | Respondent | Action Types |
|--------|-----------|--------------|
| 0289816 | MALCOLMSON, ERIC SCOTT | • CFTC INJUNCTIVE ACTION |
| 0278238 | NATIONAL COMMODITIES CORPORATION INC | • CFTC INJUNCTIVE ACTION |
| 0292571 | RUSSO, JAMES JOSEPH | • CFTC INJUNCTIVE ACTION |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | • CFTC INJUNCTIVE ACTION |
| 0253752 | WILSHIRE, ANDREW ALAN | • CFTC INJUNCTIVE ACTION |

### Penalty/Event Summary

| NFA ID | Respondent | Penalty/Event | Event Date |
|--------|-----------|---------------|------------|
| 0289816 | MALCOLMSON, ERIC SCOTT | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |

| 0292571 | RUSSO, JAMES JOSEPH | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |
| 0280498 | WILSHIRE INVESTMENT MANAGEMENT CORP | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |
| 0253752 | WILSHIRE, ANDREW ALAN | • STOP SOLICITING | 12/05/2005 |
| | | • MAKE RESTITUTION TO CUSTMERS | 12/05/2005 |
| | | • OTHER (SEE NARRATIVE) | 12/05/2005 |
| | | • FINE $100000 | 12/05/2005 |
| | | • JOINT OWED | 12/05/2005 |

## Narrative Summary

### General Case Narrative

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire, Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today announced the filing of an injunctive complaint in the United States District Court for the Southern District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale, Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire, Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a customer would realize large profits from commodity options trading and by misrepresenting the risk involved in trading commodity options. According to the complaint, these defendants also misled customers about the effect current events would have on option prices by citing well-known public information that was already factored into the options prices. As also alleged, during the course of their solicitations, these defendants failed to disclose their excessively poor trading record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

-----------------------------------------------------------------------------

Updated September 28, 2004

**Narrative for 0289816 - MALCOLMSON, ERIC SCOTT**

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire,
Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a
customer would realize large profits from commodity options trading and by misrepresenting the
risk involved in trading commodity options. According to the complaint, these defendants also
misled customers about the effect current events would have on option prices by citing well-
known public information that was already factored into the options prices. As also alleged, during
the course of their solicitations, these defendants failed to disclose their excessively poor trading
record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in
September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and
severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of
defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the
Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel

Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

-----------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

**Narrative for 0278238 - NATIONAL COMMODITIES CORPORATION INC**
Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire,
Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a
customer would realize large profits from commodity options trading and by misrepresenting the
risk involved in trading commodity options. According to the complaint, these defendants also
misled customers about the effect current events would have on option prices by citing well-
known public information that was already factored into the options prices. As also alleged, during
the course of their solicitations, these defendants failed to disclose their excessively poor trading
record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in
September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and
severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of
defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the
Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel
Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

--------------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

**Narrative for 0292571 - RUSSO, JAMES JOSEPH**
Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES
AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire,
Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National
Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today
announced the filing of an injunctive complaint in the United States District Court for the Southern
District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan
Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of
Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale,
Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire, Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a customer would realize large profits from commodity options trading and by misrepresenting the risk involved in trading commodity options. According to the complaint, these defendants also misled customers about the effect current events would have on option prices by citing well-known public information that was already factored into the options prices. As also alleged, during the course of their solicitations, these defendants failed to disclose their excessively poor trading record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

--------------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of $147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

### Narrative for 0280498 - WILSHIRE INVESTMENT MANAGEMENT CORP

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire, Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today announced the filing of an injunctive complaint in the United States District Court for the Southern District of Florida against Wilshire Investment Management Corporation (WIMC) and Andrew Alan Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale, Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire, Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a customer would realize large profits from commodity options trading and by misrepresenting the risk involved in trading commodity options. According to the complaint, these defendants also misled customers about the effect current events would have on option prices by citing well-known public information that was already factored into the options prices. As also alleged, during the course of their solicitations, these defendants failed to disclose their excessively poor trading record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the

Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

---------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of $147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

### Narrative for 0253752 - WILSHIRE, ANDREW ALAN

Commodity Futures Trading Commission

Office of External Affairs (202) 418-5080

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

Release: 4997-04

For Release: September 28, 2004

U.S. COMMODITY FUTURES TRADING COMMISSION CHARGES FLORIDA BUSINESSES AND EMPLOYEES WITH FRAUD

CFTC Alleges that Wilshire Investment Management Corporation, Owner Andrew Alan Wilshire, Employees Eric Scott Malcolmson and James Joseph Russo, and Guarantor National Commodities Corporation, Inc. Fraudulently Solicited Customers to Trade Option Contracts

WASHINGTON, D.C. – The U.S. Commodity Futures Trading Commission (CFTC) today announced the filing of an injunctive complaint in the United States District Court for the Southern District of Florida against Wilshire Investment Management Corporation and Andrew Alan Wilshire of Jupiter, Florida, Eric Scott Malcolmson of Tequesta, Florida, James Joseph Russo of Palm Beach Garden, Florida, and National Commodities Corporation, Inc. of Fort Lauderdale, Florida.

The complaint alleges that since at least September 2000, the defendants WIMC, Wilshire, Malcolmson, and Russo fraudulently solicited customers by misrepresenting the likelihood that a customer would realize large profits from commodity options trading and by misrepresenting the risk involved in trading commodity options. According to the complaint, these defendants also misled customers about the effect current events would have on option prices by citing well-known public information that was already factored into the options prices. As also alleged, during the course of their solicitations, these defendants failed to disclose their excessively poor trading record.

The complaint also alleges that, pursuant to an agreement signed by the two companies in September 2000, National Commodities Corporation is WIMC's guarantor, and thus is jointly and severally liable for all of WIMC's obligations.

The CFTC is seeking preliminary and permanent injunctions against defendants, repayment of defrauded customers, the return of ill-gotten gains, and monetary penalties for violating the Commodity Exchange Act.

The following CFTC Division of Enforcement staff members are responsible for this case: Rachel Entman, Jason Gizzarelli, Karen Kenmotsu, Gretchen L. Lowe and Richard Wagner.

# # #

Media Contacts

Alan Sobba

202) 418-5080

Dennis Holden

(202) 418-5088

Page 12 of 12

Office of External Affairs

Staff Contact

Gretchen L. Lowe

Associate Director, CFTC Division of Enforcement

202-418-5379

Related Document

Complaint

-------------------------------------------------------------------------

Updated September 28, 2004 12/5/05 - Final Judgment entered. Wilshire Investment
Management Corporation; Andrew Alan Wilshire; James Joseph Russo; and Erick Scott
Malcolmson shall each pay a civil monetary penalty in the amout of $100,000. Restitution of
$147,891.99 jointly owed. All other pending motions are denied as moot and case shall be closed.

©2003-2007 National Futures Association



# Details

**MARK L. MODIST**                                                  **NFA ID: I007198**

**Current Status**

NO CURRENT STATUS

**Regulatory Actions**

| Agency | Number |
|--------|--------|
| NFA | 0 |
| CFTC | 1 |
| Exchanges | 0 |

details...

**NFA Arbitration Awards**

| Role | Number |
|------|--------|
| Claimant | 0 |
| Respondent | 0 |
| Representative | 0 |

details...

**CFTC Reparations Cases**

| Total | 0 |
|-------|---|

details...

**Also Known As**

No other names

**Security Futures Proficiency Training**

No proficiency information available

**Doing Business As**

No other names

**History**

NO HISTORY AVAILABLE

©2003-2007 National Futures Association



# Case Summary

**MARK L. MODIST**              **CFTC 97-7422**              **NFA ID: I007198**

## Respondent/Effective Date Summary

| NFA ID | Respondent | Effective Date |
|---|---|---|
| F003382 | EUREX MARKETING CORPORATION | |
| F002819 | GLOBAL ASSET MANAGEMENT F/K/A POSITIVE I | 11/21/1997 |
| F003384 | GLOBALMARK CORPORATION | |
| F002586 | GLOBEX BULLION & FINANCIAL SERVICES CORP | 12/08/1997 |
| F002575 | MIDLAND RARE COIN EXCHANGE, INC. | 12/08/1997 |
| I006796 | MITCHELL, ROBERT | 12/08/1997 |
| I007198 | MODIST, MARK L. | |
| F003388 | NORTH AMERICAN ASSET MANAGEMENT INC. | |
| F003380 | QUANTUM ADVERTISING & MARKETING INC | |
| I006797 | SANDS, TERRY | 12/08/1997 |
| F003378 | SOUTHERN ADVERTISING MARKETING INC. | |
| F003376 | SOUTHWEST RESEARCH ASSOCIATION INC | |
| 0059527 | TABB, EDWARD N | 12/08/1997 |

## Rule Summary

| NFA ID | Respondent | Rule Type |
|---|---|---|
| F003382 | EUREX MARKETING CORPORATION | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F002819 | GLOBAL ASSET MANAGEMENT F/K/A POSITIVE I | • CEA 4(a) - TRADING OFF-EXCHANGE FUTURES CONTRACTS<br>• CEA 4b(a)(i) - CHEATING OR DEFRAUDING ANOTHER PERSON PROHIBITED<br>• CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED<br>• CEA 4b(a)(iii) - WILLFUL DECEPTION/ATTEMPT PROHIBITED |
| F003384 | GLOBALMARK CORPORATION | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F002586 | GLOBEX BULLION & FINANCIAL SERVICES CORP | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F002575 | MIDLAND RARE COIN EXCHANGE, INC. | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |

| I006796 | MITCHELL, ROBERT | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F003388 | NORTH AMERICAN ASSET MANAGEMENT INC. | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F003380 | QUANTUM ADVERTISING & MARKETING INC | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| I006797 | SANDS, TERRY | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F003378 | SOUTHERN ADVERTISING MARKETING INC. | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| F003376 | SOUTHWEST RESEARCH ASSOCIATION INC | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |
| 0059527 | TABB, EDWARD N | • CEA 4b(a)(ii) - WILLFUL FALSE REPORT/STMT/RECORD PROHIBITED |

## Action Summary

| NFA ID | Respondent | Action Types |
| --- | --- | --- |
| F003382 | EUREX MARKETING CORPORATION | • CFTC INJUNCTIVE ACTION |
| F002819 | GLOBAL ASSET MANAGEMENT F/K/A POSITIVE I | • CFTC INJUNCTIVE ACTION |
| F003384 | GLOBALMARK CORPORATION | • CFTC INJUNCTIVE ACTION |
| F002586 | GLOBEX BULLION & FINANCIAL SERVICES CORP | • CFTC INJUNCTIVE ACTION |
| F002575 | MIDLAND RARE COIN EXCHANGE, INC. | • CFTC INJUNCTIVE ACTION |
| I006796 | MITCHELL, ROBERT | • CFTC INJUNCTIVE ACTION |
| I007198 | MODIST, MARK L. | • CFTC INJUNCTIVE ACTION |
| F003388 | NORTH AMERICAN ASSET MANAGEMENT INC. | • CFTC INJUNCTIVE ACTION |
| F003380 | QUANTUM ADVERTISING & MARKETING INC | • CFTC INJUNCTIVE ACTION |
| I006797 | SANDS, TERRY | • CFTC INJUNCTIVE ACTION |
| F003378 | SOUTHERN ADVERTISING MARKETING INC. | • CFTC INJUNCTIVE ACTION |
| F003376 | SOUTHWEST RESEARCH ASSOCIATION INC | • CFTC INJUNCTIVE ACTION |
| 0059527 | TABB, EDWARD N | • CFTC INJUNCTIVE ACTION |

## Penalty/Event Summary

| NFA ID | Respondent | Penalty/Event | Event Date |
| --- | --- | --- | --- |
| F003382 | EUREX MARKETING CORPORATION | • OTHER (SEE NARRATIVE) | |
| | | • DISGORGEMENT $2947360.41 | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • PREVIOUS ORDER VACATED | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • MAKE RESTITUTION TO | 10/20/1999 |

| | | CUSTMERS | |
|---|---|---|---|
| F002819 | GLOBAL ASSET MANAGEMENT F/K/A POSITIVE I | • ACCESS BOOKS | 10/20/1999 |
| | | • RECEIVERSHIP | |
| | | • EX PARTE RESTRAINING ORDER | |
| | | • FREEZE ASSETS | |
| | | • PROTECT BOOKS | |
| | | • ACCESS BOOKS | |
| F003384 | GLOBALMARK CORPORATION | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • OTHER (SEE NARRATIVE) | 10/20/1999 |
| | | • DISGORGEMENT $2947360.41 | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • PREVIOUS ORDER VACATED | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • ACCESS BOOKS | 10/20/1999 |
| F002586 | GLOBEX BULLION & FINANCIAL SERVICES CORP | • RECEIVERSHIP | |
| | | • OTHER (SEE NARRATIVE) | |
| | | • EX PARTE RESTRAINING ORDER | |
| | | • PRELIMINARY INJUNCTION | |
| | | • TRADING PROHIBITION | |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • DISGORGEMENT $2947360.41 | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| F002575 | MIDLAND RARE COIN EXCHANGE, INC. | • TRADING PROHIBITION | |
| | | • PRELIMINARY INJUNCTION | |
| | | • RECEIVERSHIP | |
| | | • EX PARTE RESTRAINING ORDER | |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |

| | | | |
|---|---|---|---|
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • DISGORGEMENT $9499950 | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| I006796 | MITCHELL, ROBERT | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • EX PARTE RESTRAINING ORDER | |
| | | • TRADING PROHIBITION | |
| | | • RECEIVERSHIP | |
| | | • PRELIMINARY INJUNCTION | |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • DISGORGEMENT $9499950 | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| F003388 | NORTH AMERICAN ASSET MANAGEMENT INC. | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • OTHER (SEE NARRATIVE) | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • DISGORGEMENT $9545137 | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| F003380 | QUANTUM ADVERTISING & MARKETING INC | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • OTHER (SEE NARRATIVE) | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • DISGORGEMENT $9545137 | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| I006797 | SANDS, TERRY | • PRELIMINARY INJUNCTION | |

| | | | |
|---|---|---|---|
| | | • EX PARTE RESTRAINING ORDER | |
| | | • RECEIVERSHIP | |
| | | • TRADING PROHIBITION | |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • DISGORGEMENT $9499950 | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| F003378 | SOUTHERN ADVERTISING MARKETING INC. | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • OTHER (SEE NARRATIVE) | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • DISGORGEMENT $ | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • STOP SOLICITING | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| F003376 | SOUTHWEST RESEARCH ASSOCIATION INC | • STOP SOLICITING | |
| | | • ACCESS BOOKS | 10/20/1999 |
| | | • ACCOUNT ORDER | 10/20/1999 |
| | | • JOINT OWED | 10/20/1999 |
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • PROTECT BOOKS | 10/20/1999 |
| | | • MAKE RESTITUTION TO CUSTMERS | 10/20/1999 |
| | | • OTHER (SEE NARRATIVE) | 10/20/1999 |
| | | • PERMANENT INJUNCTION | 10/20/1999 |
| | | • DISGORGEMENT $9545137 | 10/20/1999 |
| 0059527 | TABB, EDWARD N | • TRADING PROHIBITION | |
| | | • RECEIVERSHIP | |
| | | • PRELIMINARY INJUNCTION | |
| | | • EX PARTE RESTRAINING ORDER | |
| | | • OTHER (SEE NARRATIVE) | |
| | | • FREEZE ASSETS | 10/20/1999 |
| | | • DISGORGEMENT $806022.78 | 10/20/1999 |
| | | • MAKE RESTITUTION TO | 10/20/1999 |

CUSTMERS
* PERMANENT INJUNCTION     10/20/1999
* PROTECT BOOKS     10/20/1999
* ACCESS BOOKS     10/20/1999
* STOP SOLICITING     10/20/1999
* ACCOUNT ORDER     10/20/1999

**Narrative Summary**

### General Case Narrative

Release:4082-97 (CIV 97-7422)

For Release: November 24, 1997

CFTC CAHRGES FLORIDA COMPANIES, THREE PRINCIPALS, WITH NATIONWIDE TELEMARKETING SCHEME INVOLVING ILLEGAL OFF-EXCHANGE FUTURES CONTRACTS IN PRECIOUS METALS, HEATING OIL, OTHER COMMODITIES WASHINGTON-The Commodity Futures Trading Commission (CFTC) announced today on November 20, 1997, it filed an injunctive action in the U.S. District Court for the Southern District of Florida against Midland Rare Coin Exchange, Inc. (Midland) its president, Robert J. Mitchell, and its vice-president, Terry A. Sands; Globex Bullion and Financial Services Corporation (Globex) and its president, Edward N. Tabb; and Global Asset Management, Inc. (Global). The CFTC's complaint charges the Midland telemarketers fraudulently sell nationwide illegal off-exchange futures contracts in various commodities. Globex and Global, according to the complaint, claim to provide financing for these investments and store the purchased commodities for Midland customers. On November 21, 1997, the court entered an ex-parte order which, among other things, freezes the defendant's assets and appoints a receiver to take control of Midland, Globex, and Global.

The CFTC complaint charges that defendants violated section 4a of the CEA by selling or assisting in the sale of illegal, off-exchange futures contracts, and that Midland, Mitchell, and Sands violated section 4b of the CEA by cheating and defrauding customers through false claims concerning the profit- ability and risk associated with Midland's investment program. Commenting on the filing of this matter, CFTC Director of Enforcment Geoffrey Aronow said:

"This case is part of the Commission's continuing campaign against fraud- ulent telemarketing schemes in precious metals, heating oil and other commodities. Investors should be wary of high-pressured sales tactics and promises of quick riches with little risk."

According to the complaint, the defendant's precious metals program is a high-risk enterprise. The complaint alleges that under Midland's program a customer pays for a portion of the commodity (usually 20-23 percent) in cash (known as "initial margin"); Global, Globex, and other firms loan the customer the balance of the purchase price of the commodity and purportedly purchase and hold the commodities on behalf of Midland customers. According to the complaint, when decreases in the price of a commodity or accumulating credit and storage fees cause a customer's equity to drop below a specified level, the customer must pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claim they will monitor the market and instruct customers when they should liquidate their accounts for a profit, according to the complaint. It is only after customers receive account opening forms and documents purporting to disclose risks inherent in the investment scheme.

In its continuing litigation against the defendants, the CFTC is seeking preliminary and permanent civil injunctions in addition to other remedial relief including restitution to customers.

The Florida Comptroller's Office, the Texas Department of Public Safety, the Federal Bureau of Investigation (San Diego office), the San Diego Boiler Room Task Force, the Arizona Corporation Commission, the Utah Division of Securities, and the United States Customs Serive provided valuable assistance to the CFTC during the investigation of this matter.

12/08/97 - Appointment of permanent receiver - Janice L. Russell. Defendants shall provide the receiver with information as described in order - cooperate fully with receiver. Defendants are stayed from taking any action to enforce a claim against or on behalf of the receiver or receivership assets.

### Narrative for F003382 - EUREX MARKETING CORPORATION
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting

Page 8 of 28

to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F002819 - GLOBAL ASSET MANAGEMENT F/K/A POSITIVE I
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F003384 - GLOBALMARK CORPORATION
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should

only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage

fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F002586 - GLOBEX BULLION & FINANCIAL SERVICES CORP
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F002575 - MIDLAND RARE COIN EXCHANGE, INC.
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a

federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising

and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for I006796 - MITCHELL, ROBERT

Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in

a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

**Narrative for I007198 - MODIST, MARK L.**

Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees,"

leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F003388 - NORTH AMERICAN ASSET MANAGEMENT INC.
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits

with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal,

Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F003380 - QUANTUM ADVERTISING & MARKETING INC
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer

had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for I006797 - SANDS, TERRY

Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over

$12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

### Narrative for F003378 - SOUTHERN ADVERTISING MARKETING INC.
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

**Narrative for F003376 - SOUTHWEST RESEARCH ASSOCIATION INC**

Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

**Narrative for 0059527 - TABB, EDWARD N**
Release: 4331-99

For Release: November 3, 1999

CFTC WINS CASE AGAINST WEB OF FLORIDA FIRMS AND THEIR PRINCIPALS ENGAGED IN FRAUDULENT TELEMARKETING OF ILLEGAL FUTURES CONTRACTS

Federal District Court Rules that CFTC Has Jurisdiction Over Defendants' Sale of Highly-Leveraged Precious Metal Contracts; Orders Florida Defendants to Pay Restitution Totaling Over $12.4 Million to Defrauded Investors Nationwide

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that a federal district court has found that Midland Rare Coin Exchange, Inc. (Midland) of Lauderdale Lakes, Florida; its principals, Robert J. Mitchell of Tamarac, Florida, and Terry A. Sands of Coral Springs, Florida; and eight other defendants violated federal commodity laws by fraudulently telemarketing illegal futures contracts.

Judge William P. Dimitrouleas of the U.S. District Court for the Southern District of Florida ruled on October 20, 1999, that the defendants sold leveraged investments in such precious metals as silver, palladium, and platinum by fraudulently claiming that customers would achieve huge profits with little risk.

Judge Dimitrouleas also found that the defendants illegally sold futures contracts, which should only be sold on a contract market designated by the CFTC. Concluding that the defendants ran "a systematic scheme to defraud investors," the court permanently barred Midland, Mitchell, and Sands from the commodities industry, and ordered them to pay restitution to defrauded customers totaling over $12.4 million.

The CFTC filed a complaint against the defendants on November 20, 1997 (see CFTC News Release #4082-97, November 24, 1997). The complaint alleged that since at least 1993, Midland used high-pressure sales tactics to convince prospects that they would reap tremendous profits in a short time, with little or no risk, if they participated in the firm's investment scheme. Under Midland 's program, a customer paid for a portion of the commodity (usually 20 to 23 percent) in cash (known as "initial margin"), with other firms, including defendants Globex Bullion and Financial Services Corporation (Globex) and Global Asset Management, Inc. (Global), purporting to loan the customer the balance of the purchase price of the commodity and claiming to purchase and hold the commodities on behalf of each customer.

According to the CFTC complaint, when decreases in the price of a commodity or accumulating credit and storage fees caused a customer's equity to drop below a specified level, the customer had to pay additional money to return his or her equity to a specified level (known as "maintenance margin"). Midland telemarketers claimed they would monitor the market and instruct customers when they should liquidate their accounts for a profit.

In its October 20th ruling, the court found that, in soliciting customers to purchase the leveraged investments, Midland telemarketers falsely claimed that "investors could double, or even triple their money within a relatively short period of time" and that "a 350 percent profit was a conservative estimate."

The court concluded that "such profit and risk claims are false," finding that "the defendants cannot identify a single investor who made a profit." The court also found that "approximately fifty percent of an investor's initial investment was comprised of various commissions and fees," leading investors to suffer "a fifty percent loss as soon as they invested."

The court also concluded that defendants' commodity sales constituted futures contracts and not, as defendants characterized them, investments in physical commodities. In so ruling, the court rejected "self-serving statements from defendants [designed] to evade the CFTC's legitimate jurisdiction."

In addition to the orders entered against Midland, Mitchell, and Sands, the court barred defendants Edward N. Tabb, Globex Bullion and Financial Services Corp., Eurex Marketing Corporation, GlobalMark Corporation, Southwest Research Associates, Inc., Southern Advertising and Marketing, Inc., Quantum Advertising and Marketing, Inc., and North American Asset Management, Inc. from the commodities industry, and ordered each of them to pay restitution for their unlawful actions associated with the Midland telemarketing fraud scheme and a similar fraudulent scheme carried out by Eurex Marketing Corporation.

CFTC has Continuing Litigation against Two of the Defendants

The CFTC's litigation continues as to defendant Global Asset Management, Inc. and its principal, Mark Modist. The CFTC is seeking permanent civil injunctive and other remedial relief as to both. The CFTC's complaint alleges that Global and Modist aided and abetted Midland's illegal sale of futures contracts. It also charges that Modist issued reports to customers that charged "storage fees" when Modist did not, in fact, purchase and store commodities on behalf of Midland customers and charged "credit fees" when Modist did not lend Midland customers any funds for the purchase of commodities.

# # #

©2003-2007 National Futures Association

# Regulatory Actions

**MARK L. MODIST**                                                        **NFA ID: I007198**

This page includes information regarding the **Case History** of these matters concerning the person or firm you are researching. It may also include the **Outcome** if the cases have been resolved regarding this person or firm.

Just like in all legal proceedings, when regulatory actions are resolved, it is almost always by settlement, not adjudication. A settlement may result in the imposition of a penalty without a determination of the merits of the charges or formal findings of wrongdoing. If the particular matter you are interested in has been resolved, please refer to the **Narrative**, and for certain NFA cases, the decision as provided in the **Case Documents** summary, to see whether it was adjudicated or settled.

| Contributor | Case # | Action Type | Effective Date | Case Outcome |
| --- | --- | --- | --- | --- |
| CFTC | 97-7422 | • CFTC INJUNCTIVE ACTION | | |

Westlaw.

407 F.Supp.2d 1304                                                                    Page 1

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

**H**
Briefs and Other Related Documents
Commodity Futures Trading Com'n v. Wilshire Inv.
Management Corp.S.D.Fla.,2005.
United States District Court,S.D. Florida.
COMMODITY FUTURES TRADING
COMMISSION, Plaintiff,
v.
WILSHIRE INVESTMENT MANAGEMENT
CORPORATION, National Commodities
Corporation, Inc., Andrew Alan Wilshire, Eric Scott
Malcolmson and James Joseph Russo, Defendants.
**No. 04-80862-CIV.**

Dec. 5, 2005.

**Background:** Commodity Futures Trading
Commission (CFTC) brought enforcement action
against investment firm and certain brokers.

**Holdings:** The District Court, Middlebrooks, J.,
held that:

(1) brokers violated anti-fraud provisions of
Commodity Exchange Act (CEA) and applicable
regulation by making several materially misleading
statements and omissions that exaggerated profit
potential and downplayed risk and by failing to
disclose that nearly 90% of their customers lost
money;

(2) investment firm was vicariously liable for its
employees' violations;

(3) investment firm's chief executive officer's
(CEO) was liable not only as a "controlling person"
but also for failure to diligently supervise brokers;

(4) injunction barring defendant brokers and
investment firm from engaging in any
commodity-related activity, including soliciting new
customers was appropriate; and

(5) restitution and maximum fines were appropriate
remedies.

Requested relief of injunction, restitution, and civil
penalty granted.
West Headnotes
**[1] Commodity Futures Trading Regulation 83H**
**☜⟹17**

83H Commodity Futures Trading Regulation
    83HI Regulation in General
        83Hk11 Trading
           83Hk17 k. Fraud or Manipulation. Most
Cited Cases
In an enforcement action, Commodity Futures
Trading Commission (CFTC) must prove three
elements to establish liability for fraud: (1) the
making of a misrepresentation, misleading
statement, or a deceptive omission; (2) scienter;
and (3) materiality. 17 C.F.R. § 33.10(a, c).

**[2] Commodity Futures Trading Regulation 83H**
**☜⟹17**

83H Commodity Futures Trading Regulation
    83HI Regulation in General
        83Hk11 Trading
           83Hk17 k. Fraud or Manipulation. Most
Cited Cases
Brokers, who suggested to clients that they could
make substantial profits by relying on seasonal
trends and historical prices, violated anti-fraud
provisions of Commodity Exchange Act (CEA) and
applicable regulation by making several materially
misleading statements and omissions that
exaggerated profit potential and downplayed risk
and by failing to disclose that nearly 90% of their
customers lost money. Commodity Exchange Act, §
4c(b), 7 U.S.C.A. § 6c(b); 17 C.F.R. § 33.10.

**[3] Commodity Futures Trading Regulation 83H**
**☜⟹17**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304                                                                 Page 2

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

83H Commodity Futures Trading Regulation
   83HI Regulation in General
      83Hk11 Trading
         83Hk17 k. Fraud or Manipulation. Most Cited Cases
A representation or omission is "material" for purposes of Commodity Exchange Act (CEA) if a reasonable investor would consider it important in deciding whether to make an investment. Commodity Exchange Act, § 1 et seq., 7 U.S.C.A. § 1 et seq.

**[4] Commodity Futures Trading Regulation 83H**
**&#8656;27**

83H Commodity Futures Trading Regulation
   83HI Regulation in General
      83Hk23 Effect of Violation of Regulations
         83Hk27 k. Vicarious Liability of Employers and Others. Most Cited Cases
Investment firm was vicariously liable for its employees' violations of Commodity Exchange Act (CEA) where employees made their fraudulent solicitations within the scope of their employment with firm. Commodity Exchange Act, § 2(a)(1)(B), 7 U.S.C.A. § 2(a)(1)(B).

**[5] Commodity Futures Trading Regulation 83H**
**&#8656;27**

83H Commodity Futures Trading Regulation
   83HI Regulation in General
      83Hk23 Effect of Violation of Regulations
         83Hk27 k. Vicarious Liability of Employers and Others. Most Cited Cases
Given investment firm's chief executive officer's (CEO) own assertions about how extensively he monitored his brokers, he must have either known what their solicitation tactics were or, at the very least, been willfully blind to brokers' violations of Commodity Exchange Act (CEA), and therefore CEO was liable not only as a "controlling person" but also for failure to diligently supervise brokers; CEO supervised training, monitored solicitations, and was responsible for ensuring compliance with the Commodity Futures Trading Commission's (CFTC) rules and regulations. Commodity Exchange Act, § 13(b), 7 U.S.C.A. § 13c(b).

**[6] Commodity Futures Trading Regulation 83H**
**&#8656;27**

83H Commodity Futures Trading Regulation
   83HI Regulation in General
      83Hk23 Effect of Violation of Regulations
         83Hk27 k. Vicarious Liability of Employers and Others. Most Cited Cases
To show knowing inducement of conduct violating the Commodity Exchange Act (CEA), the Commodity Futures Trading Commission (CFTC), for purposes of "establishing" "controlling person" liability, must show that the controlling person had actual or constructive knowledge of the core activities that constitute the violation and allowed them to continue. Commodity Exchange Act, § 13(b), 7 U.S.C.A. § 13c(b).

**[7] Guaranty 195 &#8656;36(1)**

195 Guaranty
   195II Construction and Operation
      195k36 Scope and Extent of Liability
         195k36(1) k. In General. Most Cited Cases
**Guarantee agreement,** which indicated that guarantor was "jointly and severally liable for all obligations of [investment firm] under the **Commodities Exchange Act**" covered firm's willful violations of Act. Commodity Exchange Act, § 1 et seq., 7 U.S.C.A. § 1 et seq.

**[8] Commodity Futures Trading Regulation 83H**
**&#8656;91**

83H Commodity Futures Trading Regulation
   83HIV Injunction and Receivership
      83Hk91 k. Injunction in General. Most Cited Cases
In determining whether an injunction barring future violations of Commodities Exchange Act (CEA) is appropriate, court should consider past illegal conduct and the likelihood of future violations. Commodity Exchange Act, § 1 et seq., 7 U.S.C.A. § 1 et seq.

**[9] Commodity Futures Trading Regulation 83H**
**&#8656;91**

83H Commodity Futures Trading Regulation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304                                                                                          Page 3

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

83HIV Injunction and Receivership
    83Hk91 k. Injunction in General. Most Cited Cases
Injunction barring defendant brokers and investment firm from engaging in any commodity-related activity, including soliciting new customers was appropriate where defendants violated the Commodities Exchange Act (CEA) in dealing with at least nine customers, the violations included acts by multiple brokers at multiple times, and defendants had not acknowledged any wrongdoing, insisting rather that their sales tactics were completely legitimate. Commodity Exchange Act, § 1 et seq., 7 U.S.C.A. § 1 et seq.

**[10] Commodity Futures Trading Regulation 83H ☞79**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk79 k. Relief; Disgorgement. Most Cited Cases
In enforcement action, court has authority to order restitution under the "ancillary relief" provision of Commodities Exchange Act (CEA). Commodity Exchange Act, § 6c, 7 U.S.C.A. § 13a-1.

**[11] Commodity Futures Trading Regulation 83H ☞79**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk79 k. Relief; Disgorgement. Most Cited Cases
In enforcement action, restitution was appropriate under Commodities Exchange Act (CEA) as to those customers which lost money due to brokers' fraudulent solicitations; however, Commodity Futures Trading Commission (CFTC) was not entitled to restitution for all customer losses from 2000 through September 2004 since evidence was not sufficient to find that the wrongdoing was so systematic and pervasive at brokers' firm that every customer was harmed by fraudulent solicitation. Commodity Exchange Act, § 6c, 7 U.S.C.A. § 13a-1.

**[12] Commodity Futures Trading Regulation 83H ☞79**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk79 k. Relief; Disgorgement. Most Cited Cases
In enforcement action, maximum fine was appropriate under Commodities Exchange Act (CEA) where brokers' violations were blatant, and they and their employer were unapologetic and brazen and displayed little intention of changing their solicitation tactics. Commodity Exchange Act, § 6c(d)(1), 7 U.S.C.A. § 13a-1(d)(1).

**[13] Commodity Futures Trading Regulation 83H ☞79**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk79 k. Relief; Disgorgement. Most Cited Cases
In enforcement action, it was inappropriate to impose a separate fine on guarantor, which was jointly and severally liable for investment firm's fine for violations of Commodities Exchange Act (CEA) since guarantor was not liable for any of its own conduct. Commodity Exchange Act, § 6c(d)(1), 7 U.S.C.A. § 13a-1(d)(1).

**[14] Commodity Futures Trading Regulation 83H ☞79**

83H Commodity Futures Trading Regulation
    83HIII Civil Remedies in General
        83Hk79 k. Relief; Disgorgement. Most Cited Cases
Disgorgement is a valid remedy for Commodities Exchange Act (CEA) violations. Commodity Exchange Act, § 1 et seq., 7 U.S.C.A. § 1 et seq.

**\*1306** Allison Lurton, Rachel Entman, Jason Gizzarelli, Commodity Futures Trading Office, Division of Enforcement, Washington, DC, for Plaintiff.
Robert Lawrence Bonner, Homer & Bonner, Francisco Oscar Sanchez, Homer Bonner & Delgado, Miami, FL, for Defendants.

***TRIAL ORDER***
MIDDLEBROOKS, District Judge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

THIS CAUSE comes before the Court upon a Complaint, [DE # 1], filed on September 14, 2004. In the Complaint, Plaintiff, the Commodity Futures Trading Commission ("CFTC"), alleges that Defendants violated the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. §§ 1 *et seq.,* and applicable CFTC Regulations. Specifically, the CFTC alleges that Defendants violated 17 C.F.R. § 33.10(a) & (c) (2003) which makes it unlawful

for any person directly or indirectly: (a) To cheat or defraud or attempt to cheat or defraud any other person; ... (c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

*Id.*

By allegedly violating the CFTC's regulations on commodity transactions, the CFTC maintains that Defendants also violated 7 U.S.C. § 6c(b) (2002) which provides that

no person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this Act ... contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

*Id.*

A four-day bench trial in this matter was held from August 8-11, 2005. During that time, the Court heard argument by the parties and testimony from multiple witnesses. The Court has reviewed the record, including the trial transcript, all evidence admitted at trial, the parties' post-trial filings, and is otherwise fully apprised in the premises.

### I. FINDINGS OF FACT

The evidence at trial consisted mostly of testimony by nine clients of Wilshire Investment Management Corporation (WIM), two auditors from the National Futures Association (NFA), and Defendants**\*1307** Eric Scott Malcolmson ("Malcolmson"), James

Joseph Russo ("Russo"), and Andrew Wilshire ("Wilshire"). The most telling aspect of the trial was the defendants' testimony. While it is understandably difficult to confront testimony by several investors about events transpiring years before, the defendants' testimony was simply not credible. They emphatically claimed that all the testimony of the investors was false. Although several of the investors had no previous experience in trading commodities or options, the brokers claimed that these novices always insisted on making their own decisions about trades and that many of the losses occurred when the investors disregarded their advice.

The Defendants would rarely answer a question directly. Rather than answer the question asked, a defendant would provide a torrent of jargon about "trading strategies," "systematic approaches," "computer generated signals," and "technical analysis."

The defendants claimed to be unable to remember when they had last read their deposition testimony, when they had made changes in their written direct testimony, or even what they had said moments before. Yet the defendants insisted that not only was the investors' testimony untrue, but that the defendants' accurately remembered all of the detailed conversations with their clients. While the defendants adamantly denied promising their clients high profits, suggesting that their other clients had been very successful, downplaying the risks of commodity trading, or using seasonal information to suggest profit potential, the investors' testimony consistently indicated otherwise. Indeed, the pattern established by the investors' testimony, despite the defendants' protestations, is undeniable.

The Court must first determine what specific statements were made to each investor by Defendants Russo, Malcolmson, and Wilshire. Based on the trial testimony, the Court finds the following:

#### a. Tony Del Duco

Mr. Del Duco was initially contacted by Jon Vasta,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

a WIM account executive, who wanted him to open an account with WIM. Vasta told Mr. Del Duco that if he invested with Vasta, he would "make money." Vasta specifically referenced the approaching cold winter and said, because of this, heating oil was going to go "through the roof" and Mr. Del Duco could take advantage of the "seasonal swing."

Later, after losing money on the initial heating oil trades, Vasta told Mr. Del Duco that he should purchase additional options in soybeans. Vasta promised that Mr. Del Duco would "at the very least " break even on the soybean trade, and would most likely recoup all his losses and make some money.

Mr. Del Duco also had several conversations with Andrew Wilshire. During at least one conversation, Wilshire assured Mr. Del Duco that WIM's other clients were making money and Mr. Del Duco would too if he "stuck it out." Wilshire also promised that if Mr. Del Duco stayed with WIM, the company would make Mr. Del Duco's money back for him.

### b. Daniel McNamee

Mr. McNamee received a phone call from James Russo, an Associated Person ("AP") of WIM, after responding to an Internet "pop-up" ad for educational materials on commodity trading. Russo indicated that he specialized in options trading and that these options entailed "little or no risk unless the trader was a complete moron." Russo also indicated that options trading had an infinite "upside" and that profits were almost " guaranteed." Furthermore,**\*1308** Russo claimed that "all his clients" who closely follow his recommendations realize significant profits in short periods of time. Over the course of several months, Russo constantly called Mr. McNamee, pressuring him to invest and suggesting that options trading would fund both Mr. McNamee's retirement and his children's education "within a few months." After Mr. McNamee opened an account at WIM, he spoke with Andrew Wilshire, who assured him that Russo was one of his best traders. Russo recommended investing in Japanese Yen, assuring Mr. McNamee that it was a "sure thing" and a " home run." When this investment failed, in May 2002, Russo encouraged McNamee to purchase

crude oil options because Iraq was going to embargo oil sales to the U.S.

### c. Dennis Albrecht

Mr. Albrecht received a call from Eric Malcolmson, another WIM AP, after contacting WIM on the Internet. Malcomson said that he had just helped another client double or triple his investment. Mr. Albrecht had no experience in trading commodities or options. In January 2002, based on Mr. Malcolmson's advice, Mr. Albrecht invested first $5,000 and later an additional $15,000 in Japanese Yen. By March 2002, Mr. Albrecht had lost all but $23.94.

### d. Doreen Daidone

Ms. Daidone received a phone call from Malcolmson in 2000. Malcolmson repeatedly told her "I know I can make you money" and represented that he had been very successful making other clients rich through commodities trading. Malcolmson suggested investing in natural gas because as the winter wore on and grew colder people would use more gas for heat. He also told Ms. Daidone not to worry about risk and continually emphasized profit potential. After Ms. Daidone's initial investment disappeared, and she indicated a desire to close her account, Malcolmson state "I will make your money back."

### e. Charles Bolam

Mr. Bolam also dealt with Eric Malcolmson. Malcolmson suggested that his experience and guidance would greatly reduce the risk of options trading. He encouraged Mr. Bolam to invest immediately because "time [was] critical" to take advantage of a record low in Japanese Yen. Malcolmson said that Mr. Bolam could make a large return immediately and insisted that he would miss a great opportunity if he did not invest immediately. Malcolmson did not address his clients' losses and only spoke about potential gains.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304                                                                                      Page 6

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

### f. Bruce McLean

Malcolmson contacted Mr. McLean in April 2001. Malcolmson claimed that WIM's "great research team" had produced a winning trade percentage of 75%-80%, and that Malcolmson's own clients were making a lot of money. In fact, Malcolmson told Mr. McLean he could expect to double his investment in a short period. After opening his account, Mr. McLean claims that Malcolmson purchased several options without authorization, resulting in a loss of most of the account.

### g. Duane Dipert

Mr. Dipert dealt with Russo and Michael Pucci, another account executive at WIM. Mr. Dipert invested $7,000 in September 2001 based on Russo's representation that he could make $30,000 and "retire early." After losing that $7,000, Mr. Dipert continued to invest with Pucci. In June 2002, Pucci made six unauthorized trades in Mr. Dipert's account which eventually wiped out Mr. Dipert's account.

### *1309 h. George Tracy

Mr. Tracy had an account with Malcolmson. Malcolmson encouraged Mr. Tracy to add more money to his account, stating that WIM clients had made a lot of money. Malcolmson recommended purchasing heating oil options immediately, before winter arrived in the northeast, because prices would go up in the winter.

### i. John Stevens

Mr. Stevens received a call from Malcolmson in September 2000. Malcolmson described himself as "very successful" and described WIM as one of the most successful trading firms. Malcolmson claimed to have a "proven method" for making profitable trades, and that he could double or triple Mr. Stevens' investment in a short time. Malcolmson also claimed to have turned $5,000 and $10,000 accounts into $100,000 accounts. While

acknowledging that commodities trading involved some risk, Malcolmson described his method as "fool-proof."

Despite the frequent statements to these nine customers indicating that WIM clients made lots of money and that WIM brokers had methods and experience that limited the risk of trading commodities, the vast majority of WIM clients lost money. In fact, from September 2000 through September 2004, approximately 87% of WIM clients closed their accounts with a loss. *See Pl. Ex. 16.* During this period, Malcolmson and Russo's clients did even worse, losing money 88% and 89% of the time, respectively. *Id.* The largest gain any of Malcolmson's accounts closed with between 2000 and 2003 was $8,231.57; the largest gain by any of Russo's accounts was $4,192,73. *Pl. Ex. 16*, pp. 6, 9. Neither Malcolmson nor Russo nor any other WIM representative ever disclosed the firm's track record or the individual AP's track record to their clients.

In December 2003, Vilia Sutkus-Kiela and Matthew Pendell of the NFA met with Andrew Wilshire in connection with an NFA audit of WIM. Ms. Sutkus-Kiela and Mr. Pendell also conducted an exit interview with Wilshire on March 15, 2004 before issuing their audit on March 24, 2004. They presented the audit's conclusions to Mr. Wilshire, including concerns that WIM's sales solicitations were misleading and likely to deceive the public.

## II. ANALYSIS OF LIABILITY

### A. Malcolmson and Russo

[1] In a similar enforcement case brought by the CFTC, the Eleventh Circuit noted that the CFTC must prove three elements to establish liability for fraud; (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality.[FN1] *See Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.,* 310 F.3d 1321 (11th Cir.2002), *citing Hammond v. Smith Barney Harris Upham & Co.,* [1997-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

24,617 (CFTC Mar.1, 1990); *CFTC v. Trinity Finan. Group, Inc.,* Comm. Fut. L. Rep. 27,179, 1997 WL 820970 (S.D.Fla. Sept. 29, 1997), *aff'd in relevant part by CFTC v. Sidoti,* 178 F.3d 1132 (11th Cir.1999).

> FN1. The Eleventh Circuit also explicitly noted that "unlike a cause of action for fraud under the communion law of Torts, ' reliance' on the representations is not a requisite element in an enforcement action. " *R.J. Fitzgerald,* 310 F.3d at 1328, n. 6.

### 1. Making of a Misrepresentation, Misleading Statement, or Deceptive Omission

In *R.J. Fitzgerald,* the Eleventh Circuit noted that " whether a misrepresentation has been made depends on the 'overall **\*1310** message' and the 'common understanding of the information conveyed.' " *R.J. Fitzgerald,* 310 F.3d at 1328. That Court found liability for statements overemphasizing profit potential and downplaying risk. These statements included telling customers that "huge profits" of " 200 to 300%" and that customers needed act immediately because the market might "never" present such an opportunity again. *Id.* at 1329. The Court also noted that both the Court and the CFTC had previously condemned "linking profit expectations on commodities options to known and expected weather events, seasonal trends. and historical highs." *Id.* at 1330.

[2] Russo and Malcolmson made several misrepresentations and misleading statements that exaggerated profit potential and downplayed risk, similar to those condemned in *R.J. Fitzgerald.* Russo told Daniel McNamee that his suggested investments had "infinite upside," that profits were " almost guaranteed," and that investing in Yen was a "sure thing." He even went so far as to say that options trading entailed "little or no risk unless the trader was a complete moron." Russo told Duane Dipert that he could make $30,000 off of a $7,000 investment and "retire early."

Malcolmson told Dennis Albrecht and John Stevens that he had helped clients "double or triple" their

money and had turned $5,000 and $10,000 accounts into $100,000, even though 88% of his clients had lost money between 2000-2004 and the largest gain any of his clients had experienced was approximately $8,000. He guaranteed Doreen Daidone and John Stevens that he would make them money. He also suggested, to Charles Bolam, Bruce McLean, and John Stevens that his experience, research methods, and trading techniques would limit their risk, even going so far as to call his method "fool-proof." Finally, in direct contravention of previous Court and CFTC rulings, Malcolmson suggested to clients that they could make substantial profits by relying on seasonal trends and historical prices. For example, he told Doreen Daidone and George Tracy that natural gas and heating oil options (respectively) would increase as winter wore on. Just as the commercial in *R.J. Fitzgerald* told customers that they needed to act immediately to take advantage of a unique opportunity for gains in the corn market, Malcolmson told Charles Bolam that "time [was] critical" to take advantage of record lows in Japanese Yen.

The Defendants argue that their exuberant descriptions of profit potential were balanced by the risk disclosure documents that each customer signed and by the fact that each customer makes the ultimate decision of whether or not to place a trade. However, the Eleventh Circuit has consistently held that general risk disclosure statements cannot balance out clearly misleading statements. *See CFTC v. Sidoti,* 178 F.3d 1132, 1136 (11th Cir.1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); *Clayton Brokerage Co. of St. Louis v. CFTC,* 794 F.2d 573, 580-81 (11th Cir.1986) ("presentation of the risk disclosure statement does not relieve a broker of any obligation under the [Act] to disclose all material information about risk to customers."); *JCC, Inc. v. CFTC,* 63 F.3d 1557, 1569-70 (11th Cir.1995). Nor can the defendants hide behind the investment "decisions" of mostly novice investors led to believe that their broker's recommendations are fool-proof. Such a finding would fly in the face of the Act and its implementing regulations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

In addition to making misrepresentations and misleading statements, Russo and Malcolmson admittedly never disclosed**1311** that 88% and 89% of their customers, respectively, and 87% of WIM's customer overall, lose money. *R.J. Fitzgerald* found that omitting such dismal results (95% in that case), particularly in conjunction with exaggerated statements of profit potential, made the solicitations fraudulent as a matter of law. 310 F.3d at 1332-33. The Court stated that it is "misleading and deceptive to speak of 'limited risk' and '200-300' percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money." *Id.* at 1333 (citations omitted). Defendants here argue that more than 50% of all commodities trades, by necessity, end in a loss. However, the *R.J. Fitzgerald* Court specifically indicated that it is not how well a particular firm has fared in comparison to other that matters; rather the proper focus is on what a reasonable investor would want to know before investing. *Id.* Therefore, Malcolmson and Russo's failure to disclose their firm's poor trading record constitutes a deceptive omission.

### 2. Scienter

For federal securities fraud, scienter includes both intent to deceive and "severe recklessness." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282 (11th Cir.1999). This requirement can be met "when Defendant's conduct involves 'highly unreasonable omissions or misrepresentations...that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it.' " *R.J. Fitzgerald,* 310 F.3d at 1328 (quoting *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001)). In *R.J. Fitzgerald,* the Court found the defendants, who were federally registered professionals knowledgeable of the commodities markets, were reckless in linking profit expectations to seasonal trends, suggesting that the market could be timed to generate large profits, and inflating profit expectations while downplaying risks.

Again, Malcolmson and Russo's actions are closely analogous to the unacceptable behavior in *R.J.*

*Fitzgerald.* As described above, they similarly made the type of statements listed in *R.J. Fitzgerald* and consistently condemned by the Eleventh Circuit and the CFTC. Some of the statements chronicled earlier are so outrageous that Malcolmson and Russo must have known they were misleading their customers, or, at the very least, that there was a high probability of harm. Malcolmson and Russo are federally registered professionals and profess to be knowledgeable in commodities trading and familiar with their industry's solicitation requirements. In light of this experience and knowledge, virtually guaranteeing profits, making recommendations based on seasonal trends, and misrepresenting their past success records constitutes an extreme departure from the standards of ordinary care.

### 3. Materiality

[3] A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *R.J. Fitzgerald,* 310 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *R & W Technical Servs., Ltd. v. CFTC,* 205 F.3d 165, 169 (5th Cir.2000)).

One cannot seriously dispute that the misrepresentations and omissions Malcolmson and Russo made are material. Exaggerated statements of profit potential and suggestions that current conditions offer unique opportunities to profit would undoubtedly heavily influence a reasonable **1312** investor's decision to invest. *R.J. Fitzgerald,* 310 F.3d at 1330; *In re JCC, Inc.,* [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,080 (CFTC May 12, 1994), *aff'd, JCC, Inc. v. CFTC,* 63 F.3d 1557 (11th Cir.1995). Therefore, Malcolmson and Russo have clearly violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10.

### *B. Willshire Investment Management Corporation*

[4] WIM is vicariously liable for the violations of its employees. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304                                                                                            Page 9

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official agent, or other person.

Malcolmson and Russo made their fraudulent solicitations within the scope of their employment with WIM. As described in the findings of fact, at least one other WIM AP, Jon Vasta, made similar fraudulent misrepresentations to clients in the scope of his employment. The Defendants do not dispute that WIM is liable for these individuals' acts, other than to dispute the finding of an underlying violation. As the Court has found that WIM's employees have violated the Act, WIM is similarly liable.

### C. Andrew Wilshire

[5] The CFTC seeks to hold Andrew Wilshire personally liable as "controlling person." Under Section 13(b) of the CEA, 7 U.S.C. § 13c(b),

Any person who directly or indirectly, controls any person who has violated any provision of this chapter or any rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as the controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting violation.

The CFTC also asserts that Wilshire violated 17 C.F.R. § 166.3 by failing to "diligently supervise" his APs. The parties do not dispute that Andrew Wilshire qualifies as a controlling person. He is President and CEO of WIM, hires new APs and brokers, supervises training, monitors solicitations, and is responsible for ensuring compliance with the CFTC's rules and regulations. However, the parties do dispute whether Wilshire acted in good faith or knowingly induced violations of the CEA and whether he diligently supervised his subordinates.

[6] To show knowing inducement of conduct violating the CEA, the CFTC must "show that the controlling person had actual or constructive knowledge of the core activities that constitute the violation and allowed them to continue." *JCC,* 63 F.3d at 1568, *In re Spiegel,* [1987-1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,103 at 34, 767 (CFTC Jan. 12, 1988). To demonstrate constructive knowledge, the CFTC must show that Wilshire "lack[ed] actual knowledge only because he consciously avoid[ed] it." *JCC,* 63 F.3d at 1569; *In re Spiegel,* [1987-1990 Transfer Binder] ¶ 24,103 at 34, 767.

In *JCC,* the Eleventh Circuit upheld a finding of knowing inducement where the defendant was actively involved in training and monitoring sales personal, personally hired many of the APs, monitored sales solicitation efforts, and prepared sales scripts. There was also evidence that several *1313 employees had reported illegal marketing b ehavior to the defendant and that the defendant's only response was to fire one offender eight months later.

Although not identical, the facts in this case are very similar to *JCC.* Wilshire was admittedly responsible for hiring, training, and monitoring WIM's APs. His post-trial brief even argues that he takes an "active role" in ensuring his APs' compliance with NFA and CFTC rules. He had notice, at least, of Jon Vasta's and Eric Malcolmson's violations through speaking with Tony Del Duco and John Stevens. Yet, he punished neither Mr. Vasta nor Mr. Malcolmson. Furthermore, Wilshire himself indicated that he does not accurately inform his customers of his firm's loss rate, implying that other WIM APs' failure to disclose such information was condoned, if not expressly encouraged. Finally, the extent and obviousness of the soliciting violations found by the Court simply belie any argument that Wilshire did not know what was occurring. Given Wilshire's own assertions about how extensively he monitors his brokers, he must have either known what their tactics were or, at the very least, been willfully blind. These facts indicate that Wilshire is liable not only as a "controlling person," but also for failure to diligently supervise.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304                                                                    Page 10

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

### D. National Commodities Corporation, Inc. (NCCI)

[7] The CFTC seeks to hold National **Commodities** Corporation, Inc. (NCCI) liable for WIM's violation of the CEA based on a **Guarantee Agreement** between NCCI and WIM. In September 2000, NCCI and Wilshire entered into a **Guarantee Agreement**. In pertinent part, the **Guarantee Agreement** states.

[NCCI] guarantees performance by [WIM] of, and shall be jointly and severally liable for, all obligations of the introducing broker under the **Commodities** Exchange Act, as it may be amended from time to time, and the rules, regulations and orders which have been or may be promulgated thereunder with respect to the solicitation of and transactions involving all commodity customer, option customer, foreign futures customer and foreign options customer accounts of [WIM] entered into on or after the effective date of this agreement.

Pl. ex. 13. While the Defendants do not dispute the existence of this agreement or the language contained therein, they argue that NCCI did not agree to accept responsibility for intentional or willful misconduct. However, the Defendants do not point to any additional language in the agreement, any external evidence, or any principle of law to support its contention that the agreement does not cover willful or intentional misconduct.

The agreement clearly indicates that NCCI is " jointly and severally liable for *all obligations* of [WIM] under the Commodities Exchange Act..." (emphasis added). Nothing in the agreement suggests any distinction between willful violations of WIM's obligations versus merely negligent violations. The Defendants give no reason why the plain meaning is incorrect other than their conclusory statement that the agreement did not apply to willful acts. Therefore, NCCI is jointly and severally liable for WIM's violations.

### III. REMEDIES

### A. Injunction

[8] The CFTC asks this Court to enter an injunction against the Defendants, prohibiting future violations of the CEA and barring them from engaging in any commodity-related activity, including soliciting customers and funds. In determining whether an injunction is appropriate, the Court should consider past illegal conduct **\*1314** and the likelihood of future violations. *See, e.g. Sidoti,* 178 F.3d at 1137.

[9] An injunction is appropriate in this case. As detailed above, the Defendants violated the CEA in dealing with at least nine customers. The violations included acts by multiple brokers at multiple times. More importantly, with respect to the potential for future violations, the Defendants have not acknowledged any wrongdoing, insisting rather that their sales tactics were completely legitimate. In fact, the lack of candor which they demonstrated at trial belies any intent of making good faith efforts to comply with restrictions in the future.

Defendants Malcolmson, Russo, Wilshire, and WIM are specifically enjoined from violating section 4c(b) of the CEA (7 U.S.C. § 6c(b)) and 17 C.F.R. § 33.10(a)-(c). However, because the violations were blatant, brazen, and repeated, a more extensive injunction is justified. *See CFTC v. Noble Wealth Data Information Svcs., Inc.,* 90 F.Supp.2d 676 (D.Md.2000). Therefore, Defendants Malcolmson, Russo, Wilshire, and WIM are further enjoined from engaging in any commodity-related activity, including soliciting new customers.

### B. Restitution

[10] The CFTC seeks restitution to compensate the customers defrauded by the Defendants. The Court has authority to order restitution under the " ancillary relief" provision in 7 U.S.C. § 13a-1. *CFTC v. Co Petro Marketing Group, Inc.,* 680 F.2d 573, 583-584 (9th Cir.1982); *CFTC v. Midland Rare Coin Exchange, Inc.* 71 F.Supp.2d 1257, 1264 (S.D.Fla.1999).

[11] The CFTC seeks restitution for all customer losses from 2000 through September 2004, a total

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304                                                                                    Page 11

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

of over $6 million. The Defendants object that the CFTC has only presented evidence of fraudulent conduct with regards to nine customers and that the Court cannot presume, based on these few customers, that all WIM customers lost their money due to fraudulent solicitations. The CFTC argues that reliance can be presumed, either because all WIM solicitations omitted disclosure of WIM's track record or because Malcolmson and Russo's solicitations are so similar and consistent that they amount to "systematic and pervasive fraud."

The Court cannot infer, based on the evidence presented, that every WIM customer was harmed by a fraudulent solicitation. First, this case is not " primarily" an omissions case in which the Court can presume reliance. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Waters v. Int'l Precious Metals Corp.,* 172 F.R.D. 479, 485 (S.D.Fla.1996). While the Defendants' failure to disclose WIM's investment track record is certainly a significant part of the Court's fraud finding, the affirmative misrepresentations the Defendants made regarding profit potential, risk, and seasonal trends make this at least a mixed case of misrepresentation and omission. *See In re Amerifirst Securities Litigation,* 139 F.R.D. 423, 430 n. 4 (S.D.Fla.1991); *Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594 (S.D.Fla.1991).

Second, the evidence presented at trial was not sufficient to find that the wrongdoing was so systematic and pervasive in WIM that every customer was harmed by fraudulent solicitation. The CFTC tries to analogize to other non-class action cases where the Court has presumed pervasive fraud based on the testimony of a handful of customers. However, in these cases, the fraudulent acts were, by their nature, more certainly a part of every transaction. In *CFTC v. Noble Wealth,* the evidence *1315 indicated that Noble Wealth conducted all of their trades outside the interbank market where it was supposed to place orders. 90 F.Supp.2d 676 (D.Md.2000). In *FTC v. Figgie Int'l Inc.,* the finding of fraudulent misrepresentation and omission was based on standardized sales presentations and company produced promotional materials. 994 F.2d 595 (9th

Cir.1993). Here, the testimony presented primarily concerned two brokers. While the customers' testimony here did exhibit certain commonalities among Russo and Malcolmson's fraudulent tactics, there is little indication like in *Noble Wealth* or *Figgie* that similar tactics were necessarily a part of each WIM solicitation.[FN2]

> FN2. In addition to the nine testifying customers, the CFTC entered into evidence an audit report by the NFA which recounted complaints from other WIM customers. These complaints indicated additional misrepresentations by Russo and Malcolmson and similar misrepresentations by other WIM APs not named in this suit. However, the summaries of statements by WIM customers in the NFA report are inadmissible hearsay. The audit itself is hearsay, which the CFTC argued is admissible under three possible exceptions: the "public records" exception, the "business records" exception, and the "residual exception," Under the business records and residual exceptions, the statements recounted in the audit report would still constitute hearsay within hearsay.
> The public records exception, Fed.R.Evid. 803(8) does allow factual findings within government reports to be admitted. However, even assuming the NFA is a public agency under Fed.R.Evid. 803(8), the report does not present factual findings. Rather it simply recounts statements by WIM customers. Rule 803(8) only covers information based on the knowledge or observations of the writer. *Miller v. Field,* 35 F.3d 1088, 1091 (6th Cir.1994). Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible. *U.S. v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983); *Parsons v. Honeywell, Inc.* 929 F.2d 901, 907 (2d Cir.1991). Therefore, the Court cannot consider the customer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
(Cite as: 407 F.Supp.2d 1304)

Page 12

statements in the audit report for the truth of their contents and cannot use those statements as additional evidence of pervasive fraud.

Rather, this case is much closer to *CFTC v. Matrix Trading Group, Inc.,* 2002 WL 31936799 (S.D.Fla., Oct.3, 2002). In *Matrix,* the CFTC presented testimony from several defrauded customers who indicated common misrepresentations in sales solicitations. Indeed, the *Matrix* misrepresentations were virtually identical to those presented in this case. In *Matrix,* the CFTC only requested, and the Court only granted, restitution for the sixteen customers who testified at trial. *Id.* at *13-14. A similar remedy is appropriate here.

Restitution should be awarded to each of the following individuals [FN3] in the following amounts, representing their total losses.[FN4]:

> FN3. Duane Dipert entered into a settlement agreement with WIM, Wilshire, Russo, Michael Pucci, and NCCI in December 2002. Under this agreement, Mr. Dipert received $7,000.00 and agreed to release the other parties from any claims. Although the Plaintiff's evidence indicates that Mr. Dipert lost $9,908.22, the Court must respect this private agreement and consider Mr. Dipert adequately compensated.

> FN4. These figures are taken from Plaintiff's Exhibit 16 and the testimony of Lacey Dingman

1) Tony Del Duco: $88,103.17
2) George Tracy: $14,546.35
3) John Stevens: $4,988.11
4) Doreen Daidone: $4,559.89
5) Bruce McLean: $2,929.57
6) Charles Bolam: $4,905.00
7) Dennis Albrecht: $19,976.06
8) Daniel McNamee: $7,883.84

## C. Civil Penalties

[12] The CFTC also asks the Court to impose civil penalties on the Defendants. The Court has authority to impose "on any person found in the action to have committed any violation a civil penalty in the *1316 amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. § 13a-1(d)(1). As with its restitution argument, the CFTC urges the Court to base the civil penalties based on the Defendants' total earnings from all customers from 2000-2004. However, the statute specifically ties the civil penalty to specific violations. As articulated above, the Court cannot presume violations beyond those on which it heard evidence.

The Plaintiffs presented some evidence regarding the amount of commissions and fees paid by each of the testifying customers. The testifying customers apparently paid approximately $53,291.36 in commissions and fees. However, it is difficult to discern how particular commissions were divided amongst the defendants. In any event, it does not appear that triple the benefit from the testifying customers to any individual defendant exceeded $100,000.

The violations in this case were blatant. As noted above, the Defendants are unapologetic and brazen and display little intention of changing. Therefore, imposing the maximum fine allowed is justified. Malcolmson, Russo, Wilshire, and WIM will be fined $100,000 each.

[13] The CFTC also seeks a separate fine against NCCI based on their contract with WIM. However, as the CFTC itself points out, NCCI is not liable for any of its own conduct; NCCI is only involved because of the contract making it "jointly and severally liable for, all obligations of the introducing broker [WIM] under the Commodities Exchange Act." It is inappropriate to impose a separate fine on NCCI. Rather, NCCI is jointly and severably liable for WIM's fine.

### D. Disgorgement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575
**(Cite as: 407 F.Supp.2d 1304)**

[14] Finally, the CFTC seeks disgorgement of all the Defendants' ill-gotten gains. Disgorgement is a valid remedy for CEA violations. *See, e.g., CFTC v. British American Options Corp,* 788 F.2d 92, 93-94 (2d Cir.1986). However, the civil penalty imposed above is sufficient to ensure that the Defendants did not profit from defrauding the testifying customers. An additional order for disgorgement is not necessary.

### *ORDER*

In light of the foregoing, it is **ORDERED AND ADJUDGED** that:
1.) Defendants' Motion to Exclude Plaintiff's Claim for Restitution [DE # 44] is **DENIED**;
2.) Plaintiff's Motion to Exclude Certain of Defendants' Trial Exhibits [DE # 45] is **GRANTED**;
3.) Defendants' Requests for Hearing on Motions in Limine [DE # 49 & # 51] are **DENIED AS MOOT**.
4.) The relief of injunction, restitution, and civil penalty requested in the Plaintiff's Complaint is **GRANTED** as outlined above.

S.D.Fla.,2005.
Commodity Futures Trading Com'n v. Wilshire Inv. Management Corp.
407 F.Supp.2d 1304, Comm. Fut. L. Rep. P 30,282, 19 Fla. L. Weekly Fed. D 575

Briefs and Other Related Documents (Back to top)

• 2004 WL 2313719 (Trial Pleading) Complaint for Permanent Injunction, Civil Monetary Penalties and Other Equitable Relief Pursuant to the Commodity Exchange Act, as Amended, 7 U.S.C. || 1 et seq. (Sep. 14, 2004) Original Image of this Document (PDF)
• 2004 WL 2313720 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Its Motion for a Preliminary Injunction (Sep. 14, 2004) Original Image of this Document with Appendix (PDF)
• 2004 WL 2901253 (Trial Pleading) Complaint for Permanent Injunction, Civil Monetary Penalties and Other Equitable Relief Pursuant to The Commodity Exchange Act, as Amended, 7 U.S.C. || 1 et seq.

(Sep. 14, 2004)
• 9:04CV80862 (Docket) (Sep. 14, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



# Details

**JON PAUL VASTA**                                      **NFA ID: 0298613**

## Current Status

NO CURRENT STATUS

| Regulatory Actions | | NFA Arbitration Awards | | CFTC Reparations Cases | |
|---|---|---|---|---|---|
| **Agency** | **Number** | **Role** | **Number** | Total | 1 |
| NFA | 1 | Claimant | 0 | | details... |
| CFTC | 0 | Respondent | 0 | | |
| Exchanges | 0 | Representative | 0 | | |
| | details... | | details... | | |

## Also Known As

No other names

## Security Futures Proficiency Training

No proficiency information available

## Doing Business As

No other names

## History

| Status | Effective Date |
|---|---|
| ATLANTIC CAPITAL GROUP INC | |
| • ASSOCIATED PERSON PENDING STATUS WITHDRAWN | 12/06/1999 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 12/06/1999 |
| • NFA ASSOCIATE MEMBER APPROVED | 11/10/1999 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 11/10/1999 |
| BEDDOWS COMMODITIES INC | |
| • ASSOCIATED PERSON WITHDRAWN | 01/10/2000 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 01/10/2000 |
| • ASSOCIATED PERSON REGISTERED | 01/10/2000 |
| • NFA ASSOCIATE MEMBER APPROVED | 01/10/2000 |
| • ASSOCIATED PERSON PENDING | 12/15/1999 |
| • NFA ASSOCIATE MEMBER PENDING | 12/15/1999 |
| FIRST INVESTORS GRP OF PALM BEACHES INC | |
| • ASSOCIATED PERSON WITHDRAWN | 09/10/2002 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 09/10/2002 |
| • ASSOCIATED PERSON REGISTERED | 10/16/2000 |
| • NFA ASSOCIATE MEMBER APPROVED | 08/24/2000 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 08/24/2000 |
| INTERNATIONAL FUTURES CONSULTANTS | |
| • ASSOCIATED PERSON WITHDRAWN | 01/03/2003 |

| | |
|---|---|
| • NFA ASSOCIATE MEMBER WITHDRAWN | 01/03/2003 |
| • ASSOCIATED PERSON REGISTERED | 10/11/2002 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 09/18/2002 |
| • NFA ASSOCIATE MEMBER APPROVED | 09/18/2002 |
| STELLAR FUTURES | |
| • ASSOCIATED PERSON WITHDRAWN | 08/23/2000 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 08/23/2000 |
| • ASSOCIATED PERSON REGISTERED | 05/05/2000 |
| • NFA ASSOCIATE MEMBER APPROVED | 05/05/2000 |
| • ASSOCIATED PERSON PENDING | 04/18/2000 |
| • NFA ASSOCIATE MEMBER PENDING | 04/18/2000 |
| WILSHIRE COMMODITY CORPORATION | |
| • PRINCIPAL PENDING STATUS WITHDRAWN | 11/09/2004 |
| • PRINCIPAL PENDING | 11/08/2004 |
| WILSHIRE INVESTMENT MANAGEMENT CORP | |
| • NFA ASSOCIATE MEMBER PENDING STATUS WITHDRAWN | 11/09/2004 |
| • ASSOCIATED PERSON PENDING STATUS WITHDRAWN | 11/09/2004 |
| • PRINCIPAL PENDING STATUS WITHDRAWN | 04/07/2004 |
| • NFA ASSOCIATE MEMBER PENDING | 07/02/2003 |
| • ASSOCIATED PERSON PENDING | 07/02/2003 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 07/02/2003 |
| • ASSOCIATED PERSON TEMPORARY LICENSE WITHDRAWN | 07/02/2003 |
| • PRINCIPAL PENDING | 01/07/2003 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 01/03/2003 |
| • NFA ASSOCIATE MEMBER APPROVED | 01/03/2003 |
| • ASSOCIATED PERSON WITHDRAWN | 07/05/2000 |
| • NFA ASSOCIATE MEMBER WITHDRAWN | 07/05/2000 |
| • ASSOCIATED PERSON REGISTERED | 02/22/2000 |
| • NFA ASSOCIATE MEMBER APPROVED | 01/12/2000 |
| • ASSOCIATED PERSON TEMPORARY LICENSE | 01/12/2000 |

©2003-2007 National Futures Association

# Regulatory Actions

**JON PAUL VASTA**                                                    **NFA ID: 0298613**

This page includes information regarding the **Case History** of these matters concerning the person or firm you are researching. It may also include the **Outcome** if the cases have been resolved regarding this person or firm.

Just like in all legal proceedings, when regulatory actions are resolved, it is almost always by settlement, not adjudication. A settlement may result in the imposition of a penalty without a determination of the merits of the charges or formal findings of wrongdoing. If the particular matter you are interested in has been resolved, please refer to the **Narrative**, and for certain NFA cases, the decision as provided in the **Case Documents** summary, to see whether it was adjudicated or settled.

| Contributor | Case # | Action Type | Effective Date | Case Outcome |
|---|---|---|---|---|
| NFA | 03REG00023 | • NFA REGISTRATION ACTION | 12/20/2004 | • CHARGES WITHDRAWN |



# Case Summary

**JON PAUL VASTA**　　　　　**NFA 03REG00023**　　　　　**NFA ID: 0298613**

### Respondent/Effective Date Summary

| NFA ID | Respondent | Effective Date |
|---|---|---|
| 0298613 | VASTA, JON PAUL | 12/20/2004 |

### Rule Summary

| NFA ID | Respondent | Rule Type |
|---|---|---|
| 0298613 | VASTA, JON PAUL | • CEA 8a(3)(D) - PLED GUILTY TO OR CONVICTED OF FELONY NOT IN SEC. 8A(2)(D) OF CEA |

### Committee Summary

| NFA ID | Respondent | Committee |
|---|---|---|
| 0298613 | VASTA, JON PAUL | • MEMBERSHIP COMMITTEE |

### Action Summary

| NFA ID | Respondent | Action Types |
|---|---|---|
| 0298613 | VASTA, JON PAUL | • NFA REGISTRATION ACTION |

### Penalty/Event Summary

| NFA ID | Respondent | Penalty/Event | Event Date |
|---|---|---|---|
| 0298613 | VASTA, JON PAUL | • CHARGES WITHDRAWN | 11/19/2004 |

### Narrative Summary

**General Case Narrative**

**** COPIES OF DOCUMENTS LISTED BELOW ARE AVAILABLE UPON REQUEST ****

Notice of Termination of Temporary License and Intent to Deny Registration:

On June 27, 2003, NFA's President issued a Notice of Termination of Temporary License and Intent to Deny Registration ("Notice of Intent") to Jon P. Vasta ("Vasta"). The Notice of Intent alleged that on October 17, 2002, in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, in Florida v. Vasta, Case No. 01-18440CF10A, Vasta pled guilty to the third degree felony offense of leaving the scene of a crash involving injuries, in violation of Florida Statutes Section 316.027(1). The Notice of Intent charged that the fact that Vasta pled guilty to a felony offense disqualifies him from registration under Section 8a(3)(D) of the Commodity Exchange Act ("Act").

On January 3, 2003, NFA had granted Vasta a temporary license as an AP. Because it now appears that Vasta may be disqualified from registration under Section 8a(3)(D) of the Act, his temporary license shall terminate five days from the date of service of this Notice of Termination of Temporary License and Intent to Deny Registration, in accordance with NFA Registration Rule 504(a)(4).

Response to Notice of Intent:

On July 17, 2003, Vasta submitted a response to the Notice of Intent in which he does not deny the allegation contained therein. However, Vasta stated his intent to show that, notwithstanding the accuracy of such allecation, his registration would pose no substantial risk to the public.

### Narrative for 0298613 - VASTA, JON PAUL
On November 19, 2004, NFA issued a withdrawal of the Notice of Intent, after Vasta's sponsor terminated his pending registration application. To view the Withdrawal, go to Case Documents. To obtain a copy, contact NFA's Information Center.

**Case Documents Summary**

| NFA ID | Respondent | Document Type |
|--------|------------|---------------|
| 0298613 | VASTA, JON PAUL | WITHDRAWAL OF NOTICE OF INTENT |

©2003-2007 National Futures Association

BEFORE THE
NATIONAL FUTURES ASSOCIATION

In the Matter of:                          )
                                           )
JON P. VASTA                               )          NFA Case No. 03-REG-023
(NFA ID #298613),                          )
                                           )
          Applicant.                       )

## WITHDRAWAL OF NOTICE OF INTENT

On January 3, 2003, Wilshire Investment Management Corp. ("Wilshire"), a commodity trading advisor and introducing broker guaranteed by National Commodities Corporation, submitted an application for Jon P. Vasta ("Vasta") to become registered as an associated person ("AP") of the firm, pursuant to Section 4k of the Commodity Exchange Act ("Act"), 7 U.S.C. § 6k (1994).

On June 27, 2003, NFA's President issued a Notice of Termination of Temporary License and Intent to Deny Registration ("Notice of Intent") to Vasta. The Notice of Intent alleged that on October 17, 2002, in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, in Florida v. Vasta, Case No. 01-18440CF10A, Vasta pled guilty to the third degree felony offense of leaving the scene of a crash involving injuries, in violation of Florida Statutes § 316.027(1). The Notice of Intent charged that Vasta's guilty plea to a felony offense disqualifies him from registration under Section 8a(3)(D) of the Act, 7 U.S.C. § 12a(3)(D) (1994).

On November 9, 2004, Wilshire, Vasta's sponsor, filed a Form 8-T terminating Vasta's pending registration as an AP of the firm as of November 9, 2004. Under these circumstances, a Subcommittee of NFA's Membership Committee hereby determines that further proceedings pertaining to Vasta's application for registration are not warranted at this time and the Notice of Intent is accordingly withdrawn.

No finding is made herein with respect to the alleged statutory disqualification and the Withdrawal of Notice of Intent shall not preclude any further proceedings with respect to any other application for registration under the Act made by Vasta. This Withdrawal of Notice of Intent shall become effective thirty days after service on Vasta unless the Commodity Futures Trading Commission otherwise directs.

NATIONAL FUTURES ASSOCIATION

Dated: November 19, 2004          By: _____
                                     Chairman of the Subcommittee

/nam(Notc:Jon Vasta-WNOI.map)

## AFFIDAVIT OF SERVICE

I, Nancy Miskovich-Paschen, on oath state that on November 19, 2004, I served copies of the attached Withdrawal of Notice of Intent, by placing such copies in the United States Mail, postage prepaid, certified mail, return receipt requested, and by regular mail, first-class delivery, in envelopes addressed as follows:

Gary M. Sinclair, Esq.
2043 North Mohawk Street
Chicago, IL 60614

Natinal Commodities Corporation, Inc.
1700 NW 64th Street
Suite 100
Ft. Lauderdale, FL 33309
Attn: Steve Zander
      Compliance Director

Wilshire Investment Management
  Corp.
825 US Hwy One
Suite 230
Jupiter, FL 33477
Attn: Andrew Wilshire, President

and also by sending such copies in the United States Mail, postage prepaid, certified mail, return receipt requested, in envelopes addressed as follows:

Jean Webb, Secretariat
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Lawrence B. Patent
Associate Chief Counsel
Division of Trading & Markets
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Daniel Nathan, Deputy Director
Division of Enforcement
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Tempest Thomas
Proceedings Clerk
Office of Proceedings
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

_Nancy Miskovich-Paschen_
Nancy Miskovich-Paschen

Subscribed and sworn to before me
on this 19th day of November 2004.

_Mary A. Patton_
Notary Public

OFFICIAL SEAL
Mary A. Patton
Notary Public, State of Illinois
My Commission Expires 07-17-05

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

07-80464

## I. (a) PLAINTIFFS
Donna Smith

**DEFENDANTS**
Carlton Asset Management, Anthony Alba Michael, Mark L., Modist, James Joseph Russo and Jerry

FILED by

MAY 23 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

(b) County of Residence of First Listed Plaintiff  Tulsa
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Palm Beach
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Scott L. Silver, Esq., Blum & Silver, LLP, 12540 W. Atlantic Blvd.,
Coral Springs, FL 33071, (954) 255-8181

Attorneys (If Known)

West Palm Beach 07-80464-CV- thu key Hopkins

(d) Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury - Med. Malpractice | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)
☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO
JUDGE                              DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1391(a) and 28 U.S.C. 1332(a)(1)

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD
DATE

FOR OFFICE USE ONLY
AMOUNT  350   RECEIPT # 960415  IFP